Petition of McMULLEN & PITZ CONSTRUCTION CO., a corporation, for exoneration from or limitation of liability as owner of the TUG ERICH.

SOO LINE RAILROAD COMPANY, a Minnesota corporation, Libelant,

v.

The M/V POLARIS, her engines, boilers, etc., and Cleveland Tankers Company, Inc., a corporation, Respondents.

Civ. A. Nos. 60–C–251, 61–C–34.

United States District Court
E. D. Wisconsin.
June 25, 1964.

Warren A. Jackman, Chicago, Ill., for McMullen & Pitz Const. Co.

Theo. C. Robinson, Chicago, Ill., and Harney B. Stover, Jr., Milwaukee, Wis., for Cleveland Tankers Co., Inc., as Owner of Motor Vessel Polaris.

Edward D. Cleveland and Reginald W. Nelson, Milwaukee, Wis., for Soo Line R. Co.

GRUBB, District Judge.

Civil Action No. 61–C–34 is a libel in rem and in personam filed by the Soo Line Railroad Company, libelant (hereinafter referred to as "Soo"), against the M/V Polaris (hereinafter referred to as "Polaris"), and Cleveland Tankers Company, Inc., a corporation (hereinafter referred to as "Cleveland").

Civil Action No. 60–C–251 is a petition of the McMullen & Pitz Construction Co. a corporation (hereinafter referred to as "McMullen & Pitz"), for exoneration from or limitation of liability as owner of the Tug Erich.

Pursuant to stipulation, these matters were consolidated for trial.

On July 2, 1960, the Polaris, owned by Cleveland, collided with the bascule bridge owned by the Soo at Manitowoc, Wisconsin. The Polaris was then being towed by the Tug Erich, owned by McMullen & Pitz. Two collisions occurred. The Polaris, a twin-screw tank ship, was moored portside along the north shore of the Manitowoc River with her bow pointing upstream toward the Soo bridge. Between 12:30 and 1:00 A.M., Captain Pavokovich of the Polaris and Captain Dueby of the Tug Erich had a short meeting aboard the Polaris. Shortly before 1:00 A.M. the tow commenced with the tug proceeding about 40 feet ahead of the tanker's bow. It had been decided to move the vessel upstream through the bridge draw, turn around above the bridge, then come downstream through the bridge and on down the river to Lake Michigan. The Polaris' engines were under power at all times during the tow. Upon signal from the tug the bridge was promptly opened, and the light on the raised end of the bridge leaf facing the vessels was green. In its open position, on the upstream trip, the bridge leaf was elevated at the port side of the vessel.

The Polaris entered the draw of the bridge about mid-channel, heading slightly to the right to avoid the vessel Ryerson which was moored along the shoreline with its bow extending slightly into the channel about 450 feet upstream from the bridge. While the ship was in the draw, her stern on the port side swung toward the bridge, and the rolling chock plate, which extended about three feet up from the main deck, came in contact with the upstream guider of the bridge leaf. Extensive damage was caused to the bridge leaf.

The tow proceeded on into the turning basin where the Polaris was winded; then the two vessels proceeded downstream for the return passage through the draw. Meanwhile, the bridgetender had attempted to lower the leaf following the upstream collision, but was only able to lower it about 10° due to the upstream diagonal hanger of the leaf being bound against the upstream diagonal "A" frame. As they approached the bridge, Captain Dueby and Captain Pavokovich

observed the bridge was not fully open. The tug signalled the Polaris to check her progress but received no reply and therefore proceeded. Both vessels stayed to the left-hand side of the draw on the downstream trip due to the lowered position of the bridge leaf. While the Polaris was still in the draw, its stern swung to the right, and the superstructure of the starboard side came in contact with the underside of the bridge leaf.

On the early morning of this accident visibility was clear, and the wind and water current were negligible. During the tow, search lights from the Polaris illuminated the draw of the bridge and the bridge structure and the area of the channel toward which she was proceeding. The clear channel distance between the protective fender pilings along the faces of the bridge piers on either side of the bridge draw was 93.3 feet. The Tug Erich is 45 feet in length with a beam of 12 feet 6 inches and a single-screw vessel with an engine of 150 horsepower. The Polaris is a twin-screw motor tanker, 316 feet in length, with a 50 foot beam, equipped with two engines of 900 horsepower each.

The Soo brought this libel in rem and in personam against the Polaris and Cleveland. Claim was also made against McMullen & Pitz as owners of the Tug Erich, alleging negligence against those in charge of the Erich. Cleveland filed a cross-libel against Soo, alleging that the tug caused the collision by altering the course of the Polaris while she was in the draw, and that the bridge was not fully open, did not have an adequate fender system, and was constructed in violation of its permit as to the degree to which it would open.

The Court, in a pretrial order of July 25, 1963, severed the issue of damages and limitation of liability from the issue of liability. Just prior to the trial, the parties, by consent of their respective proctors, allowed McMullen & Pitz to pay to the Clerk of Court the sum of $15,000 as a limitation of liability fund, and they were discharged from any further liability for any and all claims. Their proctors then withdrew from participation in the trial. An order was entered which directs the distribution of this sum in light of the various possible findings of negligence which this court might make.

Libelant contends that the Polaris was causally negligent in the following respects:

1. Improper speed under the circumstances.

2. Improper coordination of the tow, including lack of communication with the Tug Erich.

3. Improper management and control or lookout.

Respondents contend that libelant railroad was guilty of a statutory violation in the construction of its bridge, thus imposing liability for the collision. It further contends that the bridge was not fully open at the time of the upstream collision and that the fender protective system was in a deteriorated condition, both of which were contributing causes.

Mr. Knoblauch, who had sixteen years experience as a bridgetender, testified that the Polaris was proceeding at a "lively clip" which he estimated at around four miles per hour. This was twice as fast as he considered safe. The captain of the tug testified that the speed was slow, as did the wheelsman of the Polaris. However, neither of these men were able to define the speed in terms of miles per hour. Captain Dueby, the tug's captain, was so indefinite on this point that he said it was anywhere from one to six miles per hour. Captain Pavokovich estimated that the speed was two to two and one-half miles per hour but admitted that he did not know. In light of the very ambiguous testimony of the parties who were on the two vessels and were directly involved with the speed of the two vessels as opposed to the positive testimony of the experienced bridgetender, this Court is of the opinion that the Polaris was negligent in respect to the speed at which it was operating in the close waters of the Manitowoc River in view of the

known close proximity of the moored Ryerson at the time of the accident.

The Polaris was also negligent in respect to its failure to establish a firm understanding with the tug as respects the turning process and when it should commence. The record reveals only a meager understanding between the captains of the two vessels as to where the tug should begin the turning process— on either the upstream or downstream voyage. The two men did engage in conversation prior to commencing the tow, but this conference merely resolved that the turn would be done on the upstream side of the bridge as opposed to the downstream side. Nothing was said as to the Polaris giving the tug a signal when it had cleared the draw. Nor was there any discussion as to where the tug should be when it began to pull the bow of the Polaris to the right to avoid the Ryerson on the upstream voyage. The only signals which were in effect between the two vessels were certain standard signals used on the Great Lakes which related solely to engine speed and direction.

Captain Dueby of the tug admitted that when he began turning the bow of the Polaris, he had no idea whether the ship's stern had cleared the channel. Common sense prescribed that the captain of the Polaris should have reached an agreement to communicate with the tug as to when the turn should commence or, in the alternative, designate in advance where the tug should be when it began the turn. Libelant's expert witness, Captain Seligman, an experienced Great Lakes captain, testified that the proper procedure is to arrange to signal when the turn is to be commenced. Considering the close quarters present in the Manitowoc River at the time and the known location of the Ryerson on the upstream trip, a reasonably prudent master would have arranged to either signal the tug when it was safe to begin the turn or, in the alternative, establish in advance the place where the tug should be before starting the turn. Neither procedure was followed here. Failure to establish either of these procedures constituted negligence on the part of the Polaris.

Further negligence may be imputed to the Polaris due to the conduct of the captain of the Polaris and other officers of the crew in failing to be sufficiently on guard against the premature pulling of the bow in light of the absence of any agreement as to when the turning of the bow would commence. Captain Pavokovich stated that he did not expect the tug to turn before the stern cleared the bridge, yet he never informed the tug's captain of this expectation nor did he take adequate precautions to be ready in the event the tug did act too soon. Robert Hare, the second mate, and two deck hands were stationed on the bow of the vessel. Mr. Hare was equipped with a hand microphone which enabled him to communicate with the captain. However, he had received no instructions from the captain to promptly report the tug's maneuvers. In fact, he delayed informing the captain that the tug had started to pull to the right too soon on the upstream trip until the stern was already swinging toward the bridge even though at the time he realized that the tug had started the turn prematurely. Meanwhile the captain had no idea what the tug was doing since it was out of his line of vision. He did not want the tug to start turning until the ship cleared the draw, yet he apparently remained content to rely on a mistaken belief that this would not happen. Generally the entire operation smacked of a complacency on the part of the captain and the crew which was unfounded in light of the sparse instructions previously given to the tug.

The Polaris was negligent further in failing to keep a proper lookout. Captain Pavokovich stated that he probably could have seen the Tug Erich if he had looked, but he never bothered to look. The one person who definitely could see the tug and was also in a position to communicate such observation to the captain was the second mate who was positioned on the bow of the ship. He observed the tug pulling to the right too soon but delayed alerting the captain until he witnessed the corresponding

swing of the ship's stern. By this time the warning came too late. There was an obvious breakdown in the lookout on the part of the master and in communication of what was observed by the crew to the master.

The Court finds that the Polaris was causally negligent in all of the foregoing acts and omissions.

The Tug Erich was negligent in pulling to the right too soon on the upstream voyage. The tug's captain admitted he had no idea whether the ship had cleared the draw when he began the turn. However, he was very familiar with the waters of the Manitowoc River and had assisted other vessels through this draw. He knew the length of the tow line and was familiar with the size of the Polaris. Yet he started to pull the bow of the Polaris to the right on the upstream passage before the ship had cleared the draw of the bridge. There is no doubt that he recognized the importance of not making this turn until the ship had cleared the draw, for he testified as follows:

"Q. Can you tell us * * * at what point it became necessary for you to start bearing right?

"A. Well, you just—you just know about where to start pulling because you know the length of that vessel that she is going to be clear of the bridge."

Nevertheless, he did in fact start pulling the bow prematurely on the upstream passage. The Court finds that the Tug Erich was causally negligent in the foregoing respect.

There remains the question as to whether the Soo was causally negligent in any respect. The bridge was constructed pursuant to a permit issued by the Secretary of War on October 28, 1925, pursuant to the provisions of the Rivers and Harbors Act of 1899, as amended, 33 U.S.C. § 401. The permit approved the plans submitted by the Wisconsin Central Railroad Company. Soo is the successor in interest of the Wisconsin Central Railroad Company. At the time of the accident, the bridge was owned by the Wisconsin Central Railroad Company. The approved plans illustrate a bridge open to about 84° 30'. The bridge as constructed opened to a maximum of 79° 3'. With the bridge raised to 79° 3', it would overhang the protective fender system along the face of the bridge abutment by at least nine feet more than if the bridge were raised to 84° 30'. This overhang would be substantially less at the point of impact. There is a sharp dispute between the parties as to just where the point of impact was. It is clear that it was in the lower portion of the bridge leaf in the vicinity of a cross girder. Assuming, but not deciding, that the exact point of impact is where respondents' expert claimed it was (which is about 18 inches lower than where the libelant claims), the following facts follow:

1. With the bridge raised to 79° 3', the point of contact would overhang the concrete bridge abutment by around six inches.

2. If the bridge were raised to 84° 30', this point would have been at least five inches within the concrete abutment of the bridge, and thus at least eleven inches farther back from the channel.

The failure to follow the approved plans resulted in placing this point of impact some 11 to 12 inches closer to the channel at the very minimum. If the actual point of impact were 18 inches higher, as libelant contends, it would have been closer to the channel.

Where a bridge owner fails to comply with the plans its submits for approval, it is not per se liable for damages resulting from a collision if the violation had nothing to do with the collision. City of Milwaukee v. Kensington S. S. Co., 199 F. 109 (7th Cir., 1912); Missouri River Packet Co. v. Hannibal & St. Joseph R. Co., 2 F. 285 (C.C.W.D.Mo.1880). This Court believes that the question as to whether this violation was causal is speculative except for the rule hereinafter set forth. The law imposes a burden upon the statutory violator to show that the breach could not have contributed to the disaster with any reasonable possibility where the variance is substantial.

The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873); The Fort Fetterman v. South Carolina State Highway Dept., 261 F.2d 563 (4th Cir., 1958), rehearing granted on other grounds, 268 F.2d 27 (4th Cir., 1959).

The deviation as it relates to this accident was substantial. The entire record impresses upon this court that the contact between the chock plate of the Polaris and the bridge girder involved a matter of inches. Had there been a few more inches of clearance, this accident might not have occurred. This court is bound by the rule of The Pennsylvania case. It is unable to say that the deviation from the approved plans did not with a reasonable possibility contribute to this accident. Therefore, the Court finds that the bridge must be held causally negligent due to its deviation from the approved plans.

There is the further inquiry as to whether the bridge was even fully open to its constructed potential of 79° 3' on the upstream passage. Respondents rest their claim that the bridge was not fully open on certain conclusions drawn by a civil engineer and a marine surveyor. The Court is of the opinion that these conclusions are much too speculative since they are based upon a host of assumed variables. Further, there is the direct eyewitness testimony of the bridgetender, Captain Dueby, Captain Pavokovich, and the wheelsman of the Polaris to the effect that the bridge was or appeared to be completely open. Further, libelant introduced its own expert testimony, which was no more speculative than that of respondents, which concluded that the bridge was fully open. The Court is of the opinion that in light of the direct eyewitness testimony, the bridge was open to its maximum potential of 79° 3', and so finds.

Libelant is also alleged to have been negligent in failing to properly maintain the protective fender system. Respondents contend that the faulty condition of the fender system allowed the Polaris to push it back toward the bridge abutment and thus permitted the ship to strike the bridge. Libelant denied that any of the facing timbers were broken or rotted away at the time of the accident. The Court is of the opinion that the evidence substantiates the conclusion that the fender system was in a state of disrepair prior to the collision in that certain of the fenders were broken or rotted away. However, this condition was not shown to be a cause of the accident. It would be speculative to find that the deteriorated fenders were a cause of this accident. Respondents have failed to establish that a completely sound fender system or even a new one of similar design would have withstood the force of the Polaris striking it. Mr. Stuewe, respondents' expert, stated:

> "If the fenders had been together and acting as an upright, it would have definitely *or possibly* given more resistance and there *might not* have been the contact made." (Emphasis added.)

This conclusion is obviously speculative and of no evidentiary value. Opposed to this speculation is the testimony of libelant's chief engineer who stated that the fender system as designed would provide some resistance to a ship the size of the Polaris but that it was not designed to hold a ship of that size back from the abutment. Respondents having failed to show what force a sound fender system would have resisted, the Court finds that the disrepair of the protective fender system was ordinary negligence but not a cause of this collision.

Regarding the downstream passage, the Polaris was again guilty of negligence. Captain Pavokovich was aware that the bridge was not fully open, yet he chose to proceed despite the lowered clearance.

The Tug Erich was negligent in again pulling the bow of the Polaris while she was still in the bridge draw.

The bridge was free from any causal negligence as regards the collision on the downstream trip. The deviation from the approved plans was in no way a cause of the second collision.

The foregoing statements of fact are intended as findings of fact and statements of legal conclusions, as rulings of law, in accordance with Admiralty Rule 46½, 28 U.S.C.A. following Section 2073.

Proctors for Cleveland are directed to prepare the decree in conformity herewith, submitting it to proctors for the libelant for approval as to form only.