**Complaint of Charles N. WASSON, doing business as Wasson Towing Company, owner of the MOTOR VESSEL DEL RIO, and Wasson Towing Service, Inc., Bareboat Charterer of the Motor Vessel Del Rio, for exoneration from or limitation of liability.**

No. 73–1225.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1974.

Decided April 17, 1974.

William K. Johnson, Stuart B. Bradley, Chicago, Ill., for appellant.

William J. Voelker, Jr., John E. Cassidy, Jr., Peoria, Ill., for appellee.

Before SWYGERT, Chief Judge, STEVENS, Circuit Judge, and PERRY, Senior District Judge.*

PERRY, Senior District Judge.

This is an appeal from the decision of the District Court in an admiralty action for exoneration from or limitation of liability, founded upon 46 U.S.C. §§ 183–189 and brought by Charles N. Wasson as owner of the motor vessel DEL RIO and by Wasson Towing Service, Inc., as bareboat charterer thereof

* Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

(collectively called "Wasson"), with respect to a casualty which occurred in the Illinois River at Peoria, Illinois, when a grain-loaded barge being pushed by the DEL RIO collided with a pier of a railroad bridge which spans the river between Peoria and East Peoria and is owned by the Toledo, Peoria and Western Railroad Company (called "T P & W" or "railroad company").

The complaint alleged that on February 12, 1970 the DEL RIO was proceeding down the Illinois River, pushing a tow of barges, when it collided with a pier of a railroad bridge of the T P & W at Peoria, Illinois, causing severe damage to the bridge pier, Pier No. 3, and moderate damage to the port lead barge, BARGE M-4.

The complaint alleged that the DEL RIO was free from fault, and that Wasson was free from privity and knowledge; and prayed for relief under applicable statutes and rules.

Claims were filed by the bridge owner (T P & W, the railroad company) and by the barge owner (Cargo Carriers, Inc). The proceeding was tried without a jury. The active parties in the trial were Wasson and T P & W. Cargo Carriers, Inc., took no part, electing to abide the outcome.

At the conclusion of the trial the District Court found what he called "all of the essential issues" in favor of the railroad company. The court then entered judgment in favor of the railroad company and against the petitioners (Wasson) in the sum of $878,650; and in favor of Cargo Carriers, Inc., and against the petitioners, in the sum of $13,993.90.

At the conclusion of the trial on July 19, 1972, the District Court made findings pertinent to this appeal summarized as follows:

(1). On February 12, 1970 at about 6:05 A.M., the tow of the DEL RIO,—specifically BARGE M-4, the port lead barge of the tow,—came into contact with the left descending, or east pier, of the railroad bridge, with resulting damage to the barge and to the bridge.

(2). As known to the management of its owner and its charterer, on February 12, 1970 the DEL RIO was pushing 12 grain-loaded barges arranged 3 barges wide and 4 barges long. The total length of the tow was 785 feet for the starboard and center strings and 780 feet for the port string. The total length of the DEL RIO and its tow was 896.3 feet. The width of the tow was 105 feet.

(3). In such configuration, this vessel or tow was too wide at that length to be safely navigated through the various bridges at Peoria without damage to the bridges or to their appurtenances.

(4). The Franklin Street Bridge is located immediately upriver from the T P & W railroad bridge. Because the railroad bridge crosses the river at an angle rather than directly perpendicular to the river, the distance between the east channel pier of the Franklin Street Bridge and the east channel pier of the railroad bridge is approximately 350 feet.

(5). The railroad bridge was originally built in the mid-eighteenth century. Pier No. 3 of the railroad bridge (the east channel pier here involved) was renewed in 1906 or 1907.

(6). On February 12, 1970, the date of the collision, Pier No. 3 was not protected by previously-existing guidewall, —sheer fencing,—or by timber wale protection, such previously-existing protection having been destroyed by numerous prior hammerings of river traffic, primarily large tows of steel barges.

(7). The towboats LA SALLE and KAY-A and their respective tows had collided with the sheer fencing protecting Pier No. 3 on February 4th and February 19th, respectively, in 1969. The sheer fencing was not repaired or replaced following those collisions.

(8). When the port lead barge of the DEL RIO tow, the M-4, came into con-

tact with the substantially-unprotected Pier No. 3 on February 12, 1970, the pier broke off, causing the fixed bridge span resting thereon to collapse.

(9). Immediately following the collision, BARGE M-4 rode up onto the stub of Pier No. 3 a distance of approximately the width of the pier and came to rest on top of the pier stub about one foot above the then-existing river level.

(10). The claim of Cargo Carriers, Inc., the owner of BARGE M-4, in the sum of $13,993.90 shall be allowed as damages payable only in case of liability of the DEL RIO or its owners or operators, and subject to the court's determination of the possible proportionate liability or limitation of liability as sought by Wasson.

(11). The primary and effective cause of the collision on February 12, 1970 between the DEL RIO and the railroad bridge was the excessive width of the tow of 3 barges of a total width of 105 feet, in conjunction with a length of four barges and a weight in excess of 40 million pounds, in conjunction with the known opening between bridge piers of successive bridges not over 400 feet apart involving openings of about 120 feet, leaving less than 15 feet for lateral maneuvering between those bridges and the spans of the bridge piers, requiring maneuvering close to the shore with the recognized possibility of unfavorable navigational conditions developing therefrom and the inability of the vessel, rigged as 'aforesaid, to stop forward motion when the danger of collision became apparent.

(12). Under these conditions the vessel in that configuration was not seaworthy, and that lack of seaworthiness under the conditions then known to exist, was with the knowledge and privity of both the owner and the charterer of the vessel.

(13). There was no contributory negligence on the part of the railroad company in permitting its bridge to exist on February 12, 1970 under the circumstances here otherwise found.

In addition to the foregoing findings, the District Court made, *inter alia,* the following findings in its Decision And Order On Damages, entered November 16, 1972:

1. The railroad fully complied with its War Department permit concerning the bridge, until the State of Illinois, in 1967, removed its continuance sheer fence for a distance of 208.8 feet downstream from the Franklin Street Bridge.

2. Neither government authority nor any shipping or barge freight interests asked or ordered the railroad to alter its fencing or pier protection.

The District Court concluded as a matter of law, that there could be no exoneration, and that petitioners Wasson were liable for the damages to the T P & W Railroad Company and to Cargo Carriers, Inc., without limitation.

At the time of the occurrence herein there was in existence an Illinois statute, Chapter 121, Section 193a, Illinois Revised Statutes, 1969, which reads as follows:

§ 193a. Bridge pier protections, construction of.] § 1. Every person, firm or corporation owning, leasing or managing any bridge over a navigable portion of the Illinois River shall construct and maintain in good repair, contiguous to the channel of the river, adequate pier protection for the piers of such bridge, of modern construction, and adequate to meet navigation requirements existing at the time or reasonably to be expected in the future during the life of such piers.

At the trial the petitioners introduced the following evidence which was not contradicted or impeached:

(1) By a War Department permit signed April 22, 1936 by the Chief of Engineers, the T P & W Railroad was

authorized to reconstruct the timber guide walls (sheer fencing) at its bridge. As of August 31, 1936, the reconstruction work had been completed in substantial accordance with the plans and the provisions of the War Department permit.

(2) Prior to the issuance of the permit, Lt. Col. Connolly, District Engineer, Corps of Engineers, wrote the following letter to the Superintendent of the T P & W Railroad Company:

T. P. & W. R. R. Co.
Union Station
Peoria, Illinois

> Attention: Mr. O. W. Limestall, Superintendent

Gentlemen:

On April 9, 1934, your application for a permit to rebuild the fenders at your Illinois River bridge at Peoria was returned with the request that the plans be modified to provide principally for greater strength.

The City of Peoria is now completing work on the extensive reconstruction of fenders at its Franklin Street bridge located just upstream, and in September, 1932, the Illinois Terminal Railroad System completed work on the reconstruction of fenders at its bridge located just downstream. The fenders at your bridge are now the weak and unsafe section in the continuous fender system through these three bridges and are a serious hazard to navigation.

In the interest of safety to your bridge structure as well as to navigation, may we ask that you resubmit your application with duly revised drawings for a permit to carry out the badly needed work at an early date.

> Very truly yours,
> Donald H. Connolly
> Lt. Col., Corps of Engineers
> District Engineer

(3) In 1936, subsequent to the issuance of the permit, Captain Karrick, Acting District Engineer, wrote the following letter to the Superintendent:

> May 29, 1936

Toledo, Peoria & Western Railroad
Union Station
Peoria, Illinois

> Attention: Mr. O. M. Limestall, Superintendent

Gentlemen:

Reference is made to the War Department permit issued by the Chief of Engineers on April 23, 1936, authorizing the reconstruction of the fenders along the channel span of your Illinois River bridge at Peoria, Illinois. At the time this permit was issued, it was understood that the proposed work was to be done immediately, but construction has not yet commenced.

Report has now been received that the left upstream fender is leaning four feet or more out into the channel and is in danger of falling into the channel at any time. Thus an actual *hazard* to navigation is created at an already narrow, inadequately protected bridge.

It is requested that the reconstruction of the fenders be started at once. Please acknowledge receipt of this letter, stating the dates for commencement and completion of work.

> Very truly yours,
> S. N. Karrick
> Captain, Corps of Engineers
> Acting District Engineer

(4) The timber sheer fencing as constructed under the permit and as maintained for over 30 years thereafter, consisted of an unright piling every 4 feet, backed by a support piling known as a batter piling, set at an angle behind the main piling. These pilings were driven by a pile driver to the rock at the bottom of the river. The upright piling and the batter piling consisted of 12″ by 14″ timbers. The vertical piles were connected to the batter piles with cross members or braces. Along the length of

the guidewall were horizontal timbers, called walers, which were bolted into place. The resulting timber guide wall, "sheer fencing" (or "shear fencing"), appears as illustrated in the photograph appearing hereafter.

(5) The sheer fencing, as thus constructed, remained essentially intact from 1936 through 1966. During that period the sheer fencing was frequently struck and damaged by river tows.

(6) Repairs to the sheer fencing were continually made during the period of its existence. As the result of the repairs, the sheer fencing remained essentially as originally constructed in 1936.

(7) The sheer fencing joined with upstream sheer fencing and formed a continuous, connecting, and joining wall of fencing from the railroad bridge to the Franklin Street Bridge upstream—a distance of approximately 350 feet. The railroad maintained its 166 feet of fencing and the owner of the Franklin Street Bridge—the City of Peoria—maintained the balance.

(8) In 1965 the State of Illinois became the owner of the Franklin Street Bridge and changed the manner of protecting it. The State replaced their portion of the sheer fencing with 4 protective cells, each cell made of sheet steel filled with concrete and of approximately 30 feet diameter.

(9) Mr. C. L. Patteson, President of the T P & W Railroad, testified that the railroad made a decision not to repair the sheer fencing or to replace it with clump pilings. He explained that the railroad was trying to collect from the people who knocked the sheer fencing down before the railroad company would have the funds to replace the sheer fencing.

(10) In February, 1969, the upstream sheer fencing was struck by the tow of the river towboat KAY-A and the tow of the LA SALLE. These two collisions took out all but 20 feet of the 166 feet of sheer fencing that had been maintained by the railroad company for over 30 years.

(11) The railroad company obtained estimates for repairing the sheer fencing. The bids were under $6,000 for the repair of the damage done by the LA SALLE collision, and approximately $20,000 for repairing the damage done by the KAY-A. Contracts, however, were not entered into.

(12) On November 3, 1969 the tow of the WARREN HOUGLAND, consisting of 3 empty barges, demolished the remaining 20 feet of the sheer fencing and, with the fencing gone, collided with and damaged bridge Pier Number 3.

(13) Damage to the bridge pier consisted of a structural crack in the base of the pier just above the waterline. Engineering observations indicated, however, that the pier was still structurally sufficient for handling heavy trains.

The questions raised on appeal are:

(1) Did the District Court err in finding Wasson liable?

(2) Did the District Court err in finding the railroad company free from liability?

We shall dispose of the first question by stating that we agree with the District Court's findings regarding the unseaworthiness of the DEL RIO as rigged at the time of the collision, and that we affirm the conclusion of the District Court that the unseaworthiness of the DEL RIO imported liability to her owner and charterer for the collision between the DEL RIO and the railroad bridge.

Wasson clearly admitted that when a vessel operator attempts to move a 105-feet wide tow through a 118-feet bridge span, an inherently dangerous situation is created,—a situation providing an insufficient margin of safety to allow for natural hazards such as the risk of bank suction. It is clear from the testimony of the witnesses that such bank suction did in fact occur and that it was a contributing cause to the collision. Under these circumstances, we agree with the District Court's determination that the DEL RIO, as rigged, was unseaworthy for the purpose of navigating through the railroad bridge.

There remains the question of whether the railroad company had a duty to maintain reasonable protection to the channel side of Pier No. 3. If it had

such a duty and breached it, we must hold that, in accordance with our decision in N. M. Paterson & Sons, Ltd. v. City of Chicago, 324 F.2d 254 (7th Cir. 1963), damages must be equally divided between Wasson and the railroad company.

■ We are of the opinion that a bridge owner has a duty to protect the piers of the bridge, both for the protection of the bridge and for the protection of water-borne commerce. We so held in City of Milwaukee v. Kensington S. S. Co., 199 F. 109, 111 (7th Cir. 1912), where the owner of a steamer brought suit to recover for damages incurred when the steamer, while being towed through a drawbridge, struck a stone abutment of the bridge. This Court held that the bridge owner, the City of Milwaukee, had a duty to protect the bridge abutments, which duty it breached when the timbers by which the stone abutment had been protected were allowed to rot away. There the court held as follows:

> . . . The ledge was a dangerous obstruction to navigation. Easily remedied by the maintenance of piles, it was the duty of the city to put them there, and there keep them. Failure to do this was negligence, the proximate cause of the injury. The bridge itself was an obstruction to navigation, permitted only to serve the convenience of commerce on land. Clearly it was the duty of the city to make it as safe as was reasonably possible.

Earlier, in Vessel Owners' Towing Co., et al. v. Wilson, et al., 63 F. 626 (7th Cir. 1894), the faces of the piers of a drawbridge were built out under the surface of the water. Contractors, in replacing the bridge, removed piles which had been driven around the piers to ward off vessels. This Court stated:

> That portion of the abutment below the surface of the water was . . . a concealed and imminently dangerous obstruction to the navigation of the river. As it was placed there by the

city of Chicago, so it became the duty of the city, so long as the obstruction was maintained, to so guard it that injury therefrom should not result to vessels navigating the river. Philadelphia R. Co. v. Philadelphia, etc., Towboat Co., 64 U.S. 209, 23 How. 209, 16 L.Ed. 433. That duty was sought to be discharged by maintaining spiles along the face of the obstruction, which were effectual to prevent vessels passing the draw of the bridge from coming in collision with the projecting footing courses of the abutment. The maintaining in place of these spiles, in the absence of other safeguards, was an imperative duty. Their removal was an act of negligence contributing to produce the injury here complained of. Acting under authority of the city, the contractor, as well by its contract as by the law, was liable for damages arising from the removal of the protection.

Other courts, too, have recognized the duty of a bridge owner to install and maintain structures to protect vessels from colliding with a bridge pier or abutment, or to break the force of such collision when they cannot be altogether prevented. In Pennsylvania R. R. v. The Buchanan Boys, 155 F.2d 585 (2d Cir. 1946), the railroad company sued the towboat BUCHANAN BOYS and the City of New York to recover for damages which were incurred when a barge towed by the towboat collided with the stone abutment of a drawbridge maintained by the city across the Harlem River. The Court of Appeals affirmed a decree of the District Court holding the city solely liable for negligence in opening the drawbridge, and in failing to keep the fender of the bridge abutment in proper condition.

In Southern Transp. Co. v. Philadelphia, B. & W. R. Co., 196 F. 548 (D.Md. 1912), aff'd, 205 F. 732 (4th Cir. 1913), the owner of a bridge across the Potomac River was held liable for damage to a barge which, when passing through the draw of the bridge, struck an under-water, iron-shod timber projecting

from the pier of the bridge. The court rejected the contention of the bridge owner that it was the duty of vessels to keep away from the piers and abutments of the bridge and if any vessel failed to do so, it must bear its own loss and make good any damage it did to the bridge. Said the court:

> Rough and simple craft like scows and barges well serve many commercial purposes. They are more or less unwieldly. They cannot always be depended on to move with absolute precision. Collisions between them and the piers and abutments of the bridges crossing the waters over which they are towed will be not altogether infrequent.

> \* \* \* \* \* \*

> The respondent's witnesses say that had it not been for the fender piling [,] collisions with this particular pier would have been not uncommon. Properly placed and maintained piling will usually keep vessels from coming into contact with the piers and abutments of drawbridges, and will greatly reduce the destructive effects of many of the collisions which cannot be altogether prevented.

In Cleveland-Cliffs Iron Co. v. Grosse Ile Bridge Co., 239 F.Supp. 872 (E.D. Mich.1964), which involved a collision between a steamer and a pier of a swing bridge spanning the Detroit River, the court held that the bridge owner was negligent in failing to maintain in good condition a floating fender system erected at the pier principally for the purpose of safeguarding passing vessels.

In M. P. Howlett, Inc., v. The Catherine Carrol, 56 F.Supp. 466 (E.D.N.Y. 1944), a railroad company which owned a drawbridge crossing Newark Bay failed to maintain protecting piles at the bridge abutments. The court held that this condition of the bridge constituted a menace to navigation, and found the railroad company liable for damages incurred in a collision resulting from the aforesaid condition. Said the court:

> It is common knowledge that fenders are provided at Bridge abutments, both for the protection of the abutment, and the boats passing through.

E. I. Du Pont de Nemours & Co. v. Pennsylvania R. R., 167 F.Supp. 80 (D. Del.1958), involved a collision between a towed barge and a railroad swing-type bridge. The court found the railroad company, owner of the bridge, liable because of negligence constituting the sole proximate cause of the damage to the barge which had sunk after striking submerged longitudinal beams not protected by fenders. The railroad company was negligent, held the court, in waiting until the last day of the month during which the river was closed to navigation before it commenced to repair a fender system which the railroad knew was in a state of disrepair.

As found by the District Court in the case at bar, the railroad company at the time of the casualty had not maintained the pier protection required by the War Department permit issued in 1936. We think that the failure of the railroad company to maintain the bridge in compliance with the War Department permit made the railroad company presumptively negligent and liable under the doctrine enunicated by the United States Supreme Court in The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), where the Supreme Court held that damages incurred in a collision between a steamship and a sailing bark were to be equally divided between the vessels inasmuch as both were in fault, the steamship for proceeding too swiftly in a very dense fog in the track of inward-and outward-bound vessels, and the sailing bark for ringing a bell as a fog signal (instead of sounding a foghorn) in violation of an Act of Congress Fixing Certain Rules and Regulations for Preventing Collisions on the Water. (Act of April 29, 1864, 13 Stat. 58).

The *Pennsylvania* rule was stated in the following words of the Supreme Court in 86 U.S. at page 136, 22 L.Ed. 148 (*supra*):

> . . . But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule in-

tended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

The *Pennsylvania* rule is long-settled law and should be strictly applied. Richelieu & Ontario Navigation Co. v. Boston Marine Ins. Co., 136 U.S. 408, 422, 10 S.Ct. 934, 34 L.Ed. 398 (1890); Belden v. Chase, 150 U.S. 674, 699, 14 S.Ct. 264, 37 L.Ed. 1218 (1893); Lie v. San Francisco & Portland S.S. Co., 243 U.S. 291, 298, 37 S.Ct. 270, 61 L.Ed. 726 (1917). That the *Pennsylvania* rule applies to bridges is made clear by the following cases: Nassau County Bridge Authority v. Tug Dorothy McAllister, 207 F.Supp. 167, 171 (E.D.N.Y.1962), aff'd 315 F.2d 631 (2d Cir. 1963); Dorrington v. City of Detroit, 223 F. 232, 245 (6th Cir. 1915); The Fort Fetterman v. South Carolina State Highway Dep't., 261 F.2d 563 (4th Cir. 1958), rehearing granted on other grounds, 268 F.2d 27 (4th Cir. 1959), cert. denied, 364 U.S. 910, 81 S.Ct. 272, 5 L.Ed.2d 225, rehearing denied, 364 U.S. 944, 81 S.Ct. 458, 5 L.Ed.2d 375; Shell Petroleum Co. v. Peschken, 290 F.2d 685, 687 (3rd Cir. 1961), cert. denied, 368 U.S. 900, 82 S.Ct. 172, 7 L.Ed.2d 96; Conners Marine Co. v. New York & Long Branch R. R., 87 F.Supp. 132, 135 (D.N.J.1950).

■ We follow the line of cases which hold that a violation of the provisions of a War Department permit imposes on the bridge owner the burden of showing that the violation could not have contributed to the casualty. In The Fort Fetterman v. South Carolina State Highway Dep't., 261 F.2d 563 (4th Cir. 1958), rehearing granted on other grounds, 268 F.2d 27 (4th Cir. 1959), a bascule-type bridge was constructed in 1923–1925 under authority granted by the South Carolina Legislature. The plans and specifications were submitted to the War Department and a permit was issued. The permit required that the bascule spans, when fully open, be raised to an angle of 82 degrees, but in fact the spans could only be raised to a maximum angle of 71 degrees. While attempting to pass under the bridge, a vessel "crabbed" into it. Although the vessel was navigated improperly, the court ordered a division of damages because the bridge owner had not met the burden of proving that the violation of the War Department permit could not have contributed to the collision. Pertinent language of the court appears at page 567, 261 F.2d, and is set out below.

It is the legal presumptions and conclusions of the lower court with which we must disagree. It is said by the district judge that any deviation from the approved War Department permit should not be considered unless such deviation was the proximate cause of, or contributed to, the collision and damages. We believe that the factual situation here presented calls for the clear application of the rule as stated in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, to the effect that the burden rests upon the party guilty of a statutory fault to show, not only that *probably* his fault did not contribute to the disaster, *but that it could not have done so.*

■ To like effect is Petition of McMullen & Pitz Construction Co., 230 F.Supp. 726 (E.D.Wis.1964), which involved a collision at Manitowoc, Wisconsin, between a ship being towed and a bascule bridge owned by a railroad company and built after a permit had been issued to the railroad company in 1925 by the Secretary of War. The bridge owner brought a libel against the ship and her owner. Claim was also made against the owner of the towboat. The shipowner filed a cross-libel against the bridge owner, alleging that the bridge did not have an adequate fender system and that the bridge owner was guilty of

a statutory violation in that the bridge was constructed in violation of the terms of the permit as to the degree to which it could be opened. The plans for the bridge, as submitted to and approved by the Secretary of War, illustrated a bridge open to an angle of about 84 degrees and 30 minutes. The bridge as constructed opened only to a maximum angle of 79 degrees and 3 minutes. On page 730 the court made the following statement of the law, which we approve:

> Where a bridge owner fails to comply with the plans its [sic] submits for approval, it is not per se liable for damages resulting from a collision if the violation had nothing to do with the collision. City of Milwaukee v. Kensington S. S. Co., 199 F. 109 (7th Cir., 1912); Missouri River Packet Co. v. Hannibal & St. Joseph R. Co., 2 F. 285 (C.C.W.D.Mo.1880). This Court believes that the question as to whether this violation was causal is speculative except for the rule hereinafter set forth. The law imposes a burden upon the statutory violator to show that the breach could not have contributed to the disaster with any reasonable possibility where the variance is substantial. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873); The Fort Fetterman v. South Carolina State Highway Dept., 261 F.2d 563 (4th Cir., 1958), rehearing granted on other grounds, 268 F. 2d 27 (4th Cir., 1959).

Applying the above-stated rule of law, the court then said, 230 F.Supp. at 731:

> . . . This court is bound by the rule of The Pennsylvania case. It is unable to say that the deviation from the approved plans did not with a reasonable possibility contribute to this accident. Therefore, the Court finds that the bridge must be held causally negligent due to its deviation from the approved plans.

In J. F. Schoellkopf, Jr.—Canal St. Bridge, 1961 American Maritime Cases 391 (N.D.Ind.1960), the Canal Street Bridge was a double-leaf bascule bridge which crossed the Indiana Harbor Canal. It was constructed under a War Department permit issued in 1927 and requiring the presence of 3 rows of fender timbers along the face of each bridge abutment. In 1943 the War Department issued a permit requiring 2 additional fender pile clusters. Up until 1952 the bridge owner had maintained the fender protection in compliance with the permits. Since 1952, however, the bridge was out of operation and both leaves of the bridge had been fixed in a raised position. On July 15, 1957, as a result of various accidents involving the bridge and its appurtenances, no protection fenders remained along the northwest abutment of the bridge. On that date the steamer J. F. Schoellkopf, Jr. collided with the northwest abutment of the bridge. The Indiana District Court of this seventh circuit found the bridge owner negligent for failing to maintain fender protection at the situs of the collision. Said the court, in its Conclusions of Law:

> 7. At all times material hereto the City of East Chicago, Indiana, had the absolute duty to maintain and repair the Canal Street Bridge and its appurtenances and the pile cluster lakeward of the Northwest bridge abutment in strict conformity with the War Department permits under which they were erected so as to permit vessels to negotiate the bridge draw with safety.

> 8. As they were maintained at the time and place in question, the Northwest abutment of the Canal Street Bridge and the pile cluster just lakeward thereof deviated materially from the War Department permits under which they were erected and together created a condition whereby the bridge was a nuisance, a menace and an unlawful, unreasonable and dangerous obstruction to navigation.

> 9. Had the Canal Street Bridge, its abutments and appurtenance, and the pile cluster been maintained as required, the steamer's starboard side

either would have contacted only the pile cluster or would have contacted fender timbers instead of the concrete abutment and either she would have incurred no damage at all or her damage would have been substantially reduced.

1961 American Maritime Cases, at 397–398.

■ In the case at bar Wasson contends that the railroad company, in addition to violating the provisions of the War Department permit issued in 1936, violated the provisions of an Illinois statute, Ch. 121, § 193a, Ill.Rev.Stat. 1969, which requires bridge owners to maintain adequate pier protection for their bridges. Against this contention the railroad company appears to argue that the Federal Government, by virtue of the enactment of the Rivers and Harbors Appropriations Act of 1899 (Act of March 3, 1899, 30 Stat. 1151, 33 U.S.C. § 401 et seq.), has divested The State of Illinois from all jurisdiction or authority over the Illinois River so far as the erection therein of structures affording protection to bridge piers is concerned, and that the Illinois statute is therefore void. We cannot agree.

At the outset, we take judicial notice of the fact that the Illinois River lies wholly within the State of Illinois. *See* Hubbard v. Dunne, 276 Ill. 598, 612–613, 115 N.E. 210 (1917). Next, we point out that the United States Supreme Court has repeatedly held that where a Federal law is applicable requiring consent of the Federal Government, there is a concurrent or joint jurisdiction of the State and Federal Governments over the erection of structures obstructing the navigation of a navigable stream lying wholly within a state. Lake Shore & M. S. Ry. v. Ohio, 165 U.S. 365, 17 S.Ct. 357, 41 L.Ed. 747 (1897); Cummings v. Chicago, 188 U.S. 410, 23 S.Ct. 472, 47 L.Ed. 525 (1903); Montgomery v. Portland, 190 U.S. 89, 23 S.Ct. 735, 47 L.Ed. 965 (1903).

In Lake Shore & M. S. Ry. Co. v. Ohio, *supra,* the United States Supreme Court held that the Congressional delegation to the Secretary of War of authority to direct changes in existing bridges over navigable waters of the United States or in bridges to be erected under legislative authority of any state, for the purpose of preventing obstructions to navigation, showed no intention by Congress to exercise exclusive control over navigable waters lying entirely within a state, and did not deprive states of their power to compel the removal or alteration of bridges erected over such waters without their authority.

■ It is long-established doctrine that the authority of a state over navigable waters lying entirely within its limits is plenary, subject only to such action as Congress may take in execution of its power to regulate commerce among the several states. Montgomery v. Portland, 190 U.S. 89, 23 S.Ct. 735, 47 L.Ed. 965 (1903), where the Supreme Court said, 190 U.S. at 106, 23 S.Ct. at 737:

. . . we hold that, under existing enactments, the right of private persons to erect structures in a navigable water of the United States that is entirely within the limits of a State, cannot be said to be complete and absolute without the concurrent or joint assent of both the General and state Governments.

In Escanaba Co. v. Chicago, 107 U.S. 678, 683, 2 S.Ct. 185, 27 L.Ed. 442 (1883), the question was the validity of regulations made by the City of Chicago in reference to the closing of bridges across the Chicago River between certain hours of each day. These regulations were alleged to be inconsistent with the power of Congress over interstate commerce. The Supreme Court said:

The Chicago River and its branches must, therefore, be deemed navigable waters of the United States, over which Congress under its commercial power may exercise control to the extent necessary to protect, preserve, and improve their free navigation.

But the States have full power to regulate within their limits matters of internal police . . . This power embraces the construction of roads, canals, and bridges, and the establishment of ferries, and it can generally be exercised more wisely by the States than by a distant authority . . . Illinois is more immediately affected by the bridges over the Chicago River and its branches than any other State . . .

When its power is exercised, so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction. If the power of the State and that of the Federal government come in conflict, the latter must control and the former yield . . . But until Congress acts on the subject, the power of the State over bridges across its navigable streams is plenary. . . . 107 U.S. at 683, 2 S.Ct. at 188.

Likewise, in Cummings v. Chicago, 188 U.S. 410, 430, 23 S.Ct. 472, 47 L.Ed. 525 (1903), the Supreme Court held that the tenth section of the Rivers and Harbors Appropriations Act of 1899, upon which the permit of the Secretary of War was based, was not so worded as to compel the conclusion that Congress intended to ignore altogether the wishes of the State of Illinois in respect of structures in navigable waters that are wholly within its limits. Said the court:

The effect of that act, reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a State, depend upon the concurrent or joint assent of both the National Government and the state government. The Secretary of War, acting under the authority conferred by Congress, may assent to the erection by private parties of such a structure. . Without such assent the structure cannot be erected by them. But under existing legislation they must, before proceeding under such an authority, obtain also the assent of the State acting by its constituted agencies.

188 U.S. at 431, 23 S.Ct. at 477.

Several courts have applied the *Pennsylvania* rule to the violation of state statutes or local ordinances. The Amiral Cecille, 134 F. 673 (D.Wash.1905), involved an ordinance of the City of Tacoma which prohibited the anchoring of a vessel in a prescribed area of the harbor without first receiving a permit from the harbor master. A vessel violated the ordinance and, while unlawfully anchored, was hit by another vessel in a dense fog. The court found the moving vessel at fault because it was not navigated with care appropriate to existing conditions. The court also found that the anchored vessel was a contributing cause of the collision because it did not satisfy its burden, as imposed by the *Pennsylvania* rule, of showing that its statutory violation could not have contributed to the accident.

In both The Limon, 35 F.2d 730 (1st Cir. 1929), and The Vera, 224 F. 998 (D.Mass.1916), aff'd, 226 F. 369 (1st Cir. 1915), a Massachusetts statute delegated to the harbor master of Boston the power to establish anchoring areas in Boston Harbor. Vessels anchored outside the permitted areas were involved in collisions and, in each instance, the court held that the anchored vessel had the burden of proving that her violation of the harbor regulations could not have contributed to the collision.

It has repeatedly been said that the violation of "any statutory requirement" causes a presumption against the party in default, and that when a collision occurs it is obligatory upon the party who has failed to comply with the statute to show that such default certainly did not and could not possibly contribute to the disaster. *See* The Hercules, 80 F. 998, 1001–1002 (4th Cir. 1897); The Jay Gould, 19 F. 765, 769 (E.D.Mich.1884).

It is our opinion, so far as the Illinois River is concerned, that Congress in enacting the Act of March 3, 1899, 30 Stat. 1151 (33 U.S.C. §§ 401, 403) deal-

ing with the construction of bridges over navigable rivers and with obstructions to navigable waters in general, did not intend to dispossess the State of Illinois of authority to legislate regarding the protection of bridge piers. We think that Congress simply intended by this legislation to subject bridge owners, who by Illinois statute are obligated to protect the piers of their bridges, to the further obligation of erecting pier-protection structures in accordance with plans approved by the Secretary of War (now the Secretary of Transportation).

 We find and conclude that there is no conflict between the aforementioned Illinois statute and existing Federal statutes, and that the Illinois statute does not run afoul of the supremacy clause of the United States Constitution. We are of the opinion that it is a valid statute.

 As to whether the Illinois statute was violated by the railroad company, we believe that the findings of the District Court and the evidence in the record have established beyond question that the railroad company was in violation of the Illinois statute at the time of the collision.

Applying the *Pennsylvania* rule to the case at bar, we are of the opinion that the railroad company failed to meet its burden of showing that its non-compliance with the permit issued by the War Department could not have been one of the causes of the collision between Barge M–4 and the bridge pier; further, we are of the opinion that the evidence clearly showed that the railroad company violated the provisions of Chapter 121, § 193a, Ill.Rev.Stat.1969, and that here, also, the railroad company failed, under the *Pennsylvania* rule, to meet its burden of showing that such violation of the state statute could not have been one of the causes of the aforesaid collision.

The District Court found that the railroad company complied with the War Department permit only up to 1967,—thus clearly implying non-compliance

after 1967,—and the District Court made no determination that the failure of the railroad company to comply with the permit could not have contributed to the 1970 collision with any reasonable possibility. In view of all of the foregoing, the District Court erred in its determination that the railroad company was free from contributory fault and hence free from any liability.

 It was error for the District Court to have failed to apply the *Pennsylvania* rule in view of its findings and the evidence in the case. Under the well-established admiralty rule of divided damages, where two parties are at fault in causing a collision and resulting damages, both parties must bear equally the damages caused by the collision.

The admiralty doctrine of an equal division of damages in the case of collision between two vessels when both are at fault, has long prevailed in this country as well as in England. Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218 (1893). Holding, as we do, that the District Court was in error in finding the railroad company free from liability, and being of the opinion that this case clearly calls for the application of the divided-damages rule of admiralty, the judgment of the District Court is hereby

Affirmed in part, reversed in part, and remanded for further proceedings in conformity with this opinion.

STEVENS, Circuit Judge (concurring).

There is some uncertainty in my mind concerning the railroad's obligation under the War Department permit after 1967 when the State of Illinois removed its upstream portion of the sheer fencing connecting the railroad bridge and the Franklin Street bridge. I am also uncertain about the legal significance of the Illinois statute in this kind of proceeding. However, I have no doubt that there was mutual fault because the railroad completely failed to discharge its duty to provide adequate pier protection. *Cf.* City of Milwaukee v. Kensington S.

S. Co., 199 F. 109 (7th Cir. 1912). I therefore agree that the damages should be divided. *See* N. M. Paterson & Sons, Ltd. v. City of Chicago, 324 F.2d 254, 257–258 (7th Cir. 1963).

Perhaps I should add that I cannot accept Wasson's argument that the railroad should bear the entire loss because the increasing demands of commerce over the years since 1857, when the bridge was originally constructed, have transformed a once lawful structure into an illegal obstruction to navigation. Assuming arguendo that the legal premise is valid, I am nevertheless satisfied that a private party may not, with impunity, simply knock the bridge down with an unseaworthy tow of barges.