McLAIN LINE, Inc. v. THE ARCHERS HOPE et al.

THE FOX.

THE HILLSIDE.

THE PATIENCE.

STEAMTUG REVERE, Inc. v. THE MAGNETIC et al.

STEAMTUG REVERE, Inc. v. CITIES SERVICE OIL CO. et al.

TICE TOWING LINE, Inc. v. THE SPARTAN et al.

Nos. 18932, 19332, 19629, 19684.

United States District Court
E. D. New York.
Dec. 30, 1952.

Mahar & Mason, New York City, by Frank Mason, New York City, for McLain Lines, Inc., as owners of barges Fox and Hillside.

Foley & Martin, New York City, by James A. Martin, and Warren Martin, New York City, for Steamtug Revere, Inc., as owners of tug Spartan.

Macklin, Speer, Hanan & McKernan, New York City, by Leo Hanan, New York City, for Tice Towing Lines, Inc., as owners of the tugs Magnetic and Patience.

McNutt & Nash, New York City, by Eli Ellis, New York City, for Cities Service Oil Co. and Steamer Archers Hope.

BYERS, District Judge.

These causes involve a collision in that part of the Arthur Kill which lies northerly of Howland Hook, Staten Island, on May 26, 1948, at about 6:40 p. m. D. S. T. between the steamtug Spartan on the port side of the tanker Archers Hope (to be called the Hope) and the diesel tug Magnetic lying alongside the coal barge Fox, the position of which will be stated.

These tugs came into non-violent contact as an incident to the movement of the Hope westerly in this reach of the Arthur Kill, bound for the Cities Service plant at Linden, N. J., while the Fox was the port barge in the third tier of a nine-barge tow of the tug Patience, there being three tiers of three each; the tow was bound up the Kill to the stake boats in New York Harbor, which means that it had to round Howland Hook by making about a 40 degree turn to starboard, and it was the swing of the tail of the tow toward the Jersey shore which brought the Magnetic into a position ahead of the Hope and the Spartan, off the Recreation Pier at Elizabethport, with the result that the collision occurred as stated, and the Magnetic was forced against the Fox and the latter against the barge Hillside, which was being towed alongside, causing damage to both.

The Hope was carrying a full cargo of oil and drew 31.3 forward and 29.8 aft, and all the barges in tow of the Patience were fully laden with coal.

The Hope was 542 x 68.2, and alongside to port was the Spartan, 105.9 x 25.1, and to starboard the tug Olsen, having a beam of 23 feet (her length does not appear); both tugs were made fast about one-third aft of the ship's stem, to assist in docking and as might be needed in clearing bridges, such as the B. & O. bridge shown on the chart, Patience Exhibit 1; these tugs had not been called upon to function and not being under power were in effect being towed by the Hope, which is of moment as to the handling of the Spartan at the time of the collision. The combined width of the Hope and her tugs was not to exceed 120 feet.

It may be assumed that the coal barges were all of about 100 feet in length and between 30 and 35 feet in beam, which would mean that the width of the tow would not

exceed 115 to 120 feet except in the last tier where, it will be recalled, the Magnetic was alongside the Fox, and her beam was 21 feet. The steamtug Patience was the towing tug (her power is not criticized), having out hawsers running to the port and starboard corners of the barges in the first tier, of about 200 feet. Thus, the tow measured from the stem of the Patience (which was 122.3 feet long) about 650 feet overall.

There was a flood tide moving up the Kill of a strength of one to one and one-half m. p. h., which took effect on the tail of the tow as the effort was made to round Howland Hook, swinging it out into the channel and across the center toward the Jersey shore. The effect of such a tide on such a tow was well known to those who navigated these waters, i. e., navigating officer of the Hope, Fitzgerald, who was the captain of the tug Spartan but acting as pilot on the bridge of the tanker on this occasion.

The Magnetic was placed alongside the Fox, as has been stated, for the purpose of assisting the tow to keep in its starboard side of the channel, and since her position was observed on board the tanker, and she was expected to function, this decision will necessarily involve the extent to which she performed her duties, and how far the navigator of the tanker was justified in expecting that the tail of the tow would not be allowed to swing so wide that the ship and her attending tugs would not be able to effect the agreed passing.

The findings later to be stated, will be confined to the disputed questions of fact.

The collision gave rise to the four causes listed above.

No. 18932: The owner of the barges Fox and Hillside sues the Hope, the Spartan, the Magnetic and the Patience, alleging that the force of the collision between the tugs, as stated, drove the Magnetic forcibly against the Fox and the latter against the Hillside, causing damage. The important faults alleged against the Hope are that she failed to carry out a safe passage and to keep to her starboard side of

the fairway, and that she failed to stop and back so as to avoid the collision, and that she was proceeding at an excessive rate of speed.

The same faults are alleged against the Spartan.

As to the Magnetic, that she failed to proceed on her starboard side of the fairway and to arrange a proper and safe passage with the Hope and Spartan, and failed to take timely action in releasing her lines from the tow and "in that she remained at her position alongside the barge Fox in the face of an impending collision."

As to the Patience, that she failed to arrange and carry out a safe passage with the Hope and the Spartan, and failed "to proceed with her tow on their starboard side of the fairway." Also that she attempted a passing with the other vessels "knowing that the tug Magnetic was made fast to and proceeding alongside of libellant's barge Fox and was not proceeding on her starboard side of the fairway."

The answer of the Hope alleges faults on the part of the Magnetic "in that she failed to take timely and suitable action to avoid the impending collision;" and on the part of the Patience that she failed to keep in her starboard side of the channel after exchanging signals for a port passing.

The Spartan answers in effect that she was subject to orders respecting her navigation by the pilot of the ship.

The answer for the Magnetic by her owner, the Tice Towing Line, alleges the interchange of signals between the Hope and the Patience and as the latter proceeded toward and around the bend, "the tug Magnetic at this time was pushing on the port stern boat (the Fox) in order to have the tow proceed around the bend in the usual and customary manner, which procedure was followed;" that the Hope "continued to proceed ahead at a good rate of speed, maintaining a position in approximately the center of the channel and failed to either slow down or stop, or proceed to her starboard in order to afford the tug Patience and her tow and helper tugs an

opportunity to round the bend and straighten up with the channel."

Faults are attributed to the Hope and the Spartan which are consistent with the foregoing quotations.

These pleadings have been referred to because they are characteristic of those in the other causes.

At the trial it was stipulated that this libellant is entitled to a decree for the damages complained of, depending on the resolution of the controversies between the offending vessels.

No. 19,332: The owner of the Spartan sues the Magnetic and Patience. The faults alleged as to the former are that she failed to properly navigate and did nothing to keep the tail of the tow in line and permitted it "to swing to her port side of the channel into the course of the down bound flotilla" and "in that she failed to drop away from her tow and avoid collision."

As to the Patience, that she permitted the tail of the tow to swing to the port side of the channel and that "she failed to observe the conditions of her tow and to issue orders to the tug Magnetic and the other helper tug; * *. * she failed to see that the Magnetic was properly manned;" and "in that she failed to see that the Magnetic performed her duties in holding off the tail of the tow from swinging over to the wrong side of the channel and into the pathway of approaching flotillas" (by which is meant the Hope and her tugs).

The Patience was claimed by the Reading Co., and the Magnetic by Tice Towing Co., respectively, as owners, and the faults as alleged in the first cause are relied upon in their answers.

No. 19,629: The owner of the Spartan sues the owner of the Hope and alleges the following faults on the part of the latter: Failed to carry out a safe passage and to avoid collision; and in exposing the Spartan to the danger of resulting collision. Also, "in failing to give orders to the Spartan" and "in failing to stop and back when it (the Hope) saw collision was imminent" and "in not having the steamer under proper control." (It will be remem-

bered that it was the captain of the Spartan who was navigating the Hope.)

The answer alleges the faults of the Magnetic and Patience heretofore indicated, and as to the tug Spartan "in that she failed to arrange for and carry out a safe passage with the Tug Patience and its tow" and "failed to take suitable and timely action to prevent colliding with the Tug Magnetic."

No. 19,684: The owner of the Magnetic sues the Spartan and the Hope, alleging the faults heretofore briefly alluded to, and in that cause her claim for damage of $750 was amended, on consent, at the trial to increase that sum to $1,019.80.

The answer of the Hope alleges the faults of the Magnetic heretofore indicated, and as to the Spartan that those who were in charge of her were incompetent, etc., and that she failed to arrange for and carry out a safe passage with the Patience and to take suitable and timely action to prevent colliding with the Magnetic.

The answer of the Spartan fails to allege faults on the part of the Hope, thus departing from the theory of its own pleading in the cause last above mentioned.

The foregoing were consolidated for trial, but separate decrees were agreed to be necessary.

It is desirable that the place of collision be established with reference to the center of the channel, but the briefs of counsel are not bristling with clarity on the subject. If the contention for the tow were that the third tier and the attending tug Magnetic were justifiably swinging into the Jersey side of the channel in turning Howland Hook, and that the Hope was required to respect that encroachment, F. W. Gwinn, Jr., 1940 A.M.C. 101, the argument would be at least clear and definite.

Seemingly, however, it is also suggested —if not pressed—that the Hope and Spartan were indeed beyond the center and toward the Staten Island side of the channel at the crucial moment.

It must be evident that there is a real difference between the handling of a ship which navigates entirely within her own waters, constrained perhaps by one or more

vessels which briefly oppose her progress, and one which strays from the course allotted to her by the Inland Rules, and thus causes a collision which otherwise would have been avoided.

The apparent confusion is exemplified in the following quotation from the brief filed for the tow (p. 22):

"When the captain of the Patience stated that he observed the ship take a 'sheer' (T.M. 74) and the captain of the tug Bern (later to be explained) described it as a 'little dive' (T.M. 111), they were both incorrect as to the reasons why the Archers Hope moved toward the Staten Island shore. The swing * * * towards the Staten Island shore was caused by the hard left wheel, as testified to by the pilot (see below). They undoubtedly used their respective descriptive terms because they could not possibly conceive of any one proceeding under a hard left wheel in view of the circumstances."

The captain of the Bern, who professed to have observed what took place, said, as to the position of the tail of the tow (p. 111): "Oh, I would say the tail of the tow was about in the middle of the channel then, but the head tier and the tow was closer to the Staten Island shore. You see, they were on that swing. There was a little bend in the tow." Noble of the Patience placed the point of contact (p. 75): "Oh, it must have been about 250 feet from the Staten Island shore."

There is nothing novel in the display of two strings to a bow, but something approaching an election of a theory of liability, even when based upon confused and hesitant testimony, would mitigate exploratory processes and shorten the reasoning embodied in a decision.

There is another aspect in which the contentions of the tow are ambiguous. The testimony for the Hope and the Spartan is that the Magnetic, ostensibly a helper tug whose expectable job has been described, while Howland Hook was being rounded never functioned at all, but simply rode alongside the Fox prior to and at the time

of collision. As opposed to this is the contrary testimony of the witnesses for the tow, which for reasons to be stated, carries less than complete conviction. I cannot be certain from reading the briefs for the tow, whether it is asserted as a final position that the Magnetic performed her duty with reasonable fidelity and that the collision occurred nonetheless; or that the Hope, seeing the Magnetic in the position above stated, was not justified in expecting that tug to try to arrest the inevitable swing of the tail of the tow, and should have navigated as though it was to be anticipated that the Magnetic would contribute a purely ornamental function. If that were to be accepted, the presence of the Magnetic would be an inconsequential element in the case, and the decision could not then be affected by whatever the evidence may seem to demonstrate as to her actual conduct.

It is undisputed, that when the Hope and the Patience came into mutual sight, the former was about off the red nun buoy #6 shown in Patience Exhibit 1, and the Patience was about 400 yards southwest of Howland Hook on the Staten Island side of the channel. Thus they were about three-quarters of a mile apart when the ship blew a one blast whistle to suggest a port passing, which was accepted by the Patience, and both proceeded accordingly.

Visibility was complete and there was not sufficient wind force to affect the navigation of either the ship or the tow. Apparently, daylight conditions prevailed. As has been said, there was a tide moving up the Kill, which had the described effect on the tail of the tow as Howland Hook was being rounded.

The channel was 600 feet wide at the easterly end of the Recreation Pier, indicated on the said exhibit, and that width was constant as to all parts of the channel involved in this episode. There is some dispute as to whether the actual width of the Kill along the face of the pier is indeed more than 600 feet, and the broken lines (on Exhibit 1) showing the northerly edge of the channel off the pier seem to indicate that such was the fact.

It appears from the bell book of the Hope that her engine movements were:

| | |
|---|---|
| 6:35 P.M. | Slow ahead; |
| 6:35½ P.M. | Half ahead; |
| 6:37 P.M. | Slow ahead; |
| 6:41 P.M. | Full ahead; |
| 6:42 P.M. | Slow ahead. |

It is agreed that according to the chart, the Hope had proceeded 850 yards on her way between the exchange of the one whistle signals and the collision, which means that her average speed was in excess of five knots. Evidently the progress of the tow was not so fast since the Patience seems by then to have travelled about 400 yards plus the length of the tow.

It now becomes necessary to discuss the contested aspects of the occurrence as best they can be discerned from the conflicting testimony. These conflicts have been resolved in accordance with the findings to be embodied in this opinion.

### Place of Collision between the Spartan and the Magnetic.

This is found to be off the westerly end of the Recreation Pier close to the center of the channel, but nearer to the Jersey than to the Staten Island shore.

The reasons which support this finding are that the Spartan and the Magnetic came together in the extreme arc of the turn which the channel makes, and therefore at the place of the greatest swing of the tail of the tow; this means that the Magnetic, which was inert at the time, was on the Jersey side of the center of the channel; the probabilities strongly incline to this view, although it must be owned that no witness testified as clearly and convincingly as could have been desired. The contact was light (according to everybody but counsel—pp. 82-3), since not even the head line from the Magnetic to the Fox was parted; therefore, it was at best a rubbing, and a safe passage, as had been agreed to, was avoided by a narrow margin.

It is a cause for wonder that so trivial an incident could have given rise to such an inordinate volume of litigation.

### The Handling of the Tow.

The Patience proceeded as close to the Staten Island shore as could be expected, and this held true while she was rounding Howland Hook. It is found that she was at all material times well within her starboard side of the channel. She was being assisted by the tug Bern, which was on the starboard side of the hawser tier, and by the tug Magnetic on the port side of the third tier as stated. No fault on the part of the Bern is charged; her captain testified that during the rounding movement she thrust ahead against the starboard barge in the hawser tier, to counteract the inevitable swing of the tail tier toward the Jersey shore; this testimony is uncontradicted although it would seem to introduce the exertion of power at the hawser tier, against the strain of the towing hawsers which—under the pull of the Patience—were inclining the tow close to the Staten Island shore. This was argued to be a plausible maneuver, even though not ordered by Captain Noble of the Patience; nor could it seem to have been efficacious unless simultaneously there was a lateral thrust at the tail of the tow toward the Staten Island shore, whereby the tow as a unit would be somewhat caused to pivot, so as to straighten out in the channel. Since the subject is not discussed in the briefs, it may be passed without comment.

The actual handling of the Magnetic was testified to by Prendergast, her captain; Noble, the captain of the Patience; and Pero, the captain of the Bern.

If the position of the tow at the time of rounding the point is correctly visualized, the view which Noble would have of the Fox—and therefore of the Magnetic—was diagonally along two intervening barges strung out somewhat across the channel; while perhaps it would have been physically possible for him to see quickwater under the stern of the Magnetic some 600 feet away, his testimony that the Magnetic was head up against the tow and there was quickwater coming from her must be weighed in light of his reluctance on the other hand to testify as to the distance between an O'Donnell tow, which was ahead

of the Hope, and the latter at the time of the accident; and the fact that he could not see whether there was anyone in the pilot house of the Magnetic at the time; also that he gave no instructions to the captain of the Magnetic prior to the collision, and that he saw no line between the Magnetic and the Fox; and further, that he only saw the Magnetic alongside the Fox, although as to the latter subject he seems to have been of two minds; it may be that he gave as much attention to the tail of his tow as his testimony was intended to indicate, but the chances are that in order to safely navigate the Patience he had to concentrate upon his own duties, which were engrossing; and since he issued no orders to the captains of these two helper tugs, it is a fair inference that he left it to them to function as they deemed proper.

Pero of the Bern, who was at least 200 feet nearer to the Fox than Noble, stated that he saw a line to the Fox (p. 110): "Well, the way we see it, if we don't have a line out we slide along the boat. * * * If you want me to say yes or no, all right, yes, I saw the line." He, being on the starboard side of the hawser tier, had to look across the barge to which he was made fast and two others diagonally to his port in order to see a line which, if it was rigged at all, must have been very short; and since his manner of testifying was not persuasive, that which he deposed cannot be deemed convincing.

Pease was the deckhand on the Magnetic, and his testimony is accepted because he handled the bow head line leading from the Magnetic to the Fox, which he said he placed in position at the order of Prendergast, his captain. He also said that he knew nothing about the collision, although he was clearly in a position to observe. That lack of observation is consistent with the view that the collision could not have been much more than a scraping.

The result of the foregoing is that it is found, for such importance as may attach to it, that just prior to and at the time of the collision, there was a bow line leading from the Magnetic to the Fox.

The remaining testimony for the Magnetic is that of her captain, Prendergast, and its persuasive qualities left much to be desired. He said that he was on watch, having gone on duty at 12:00 o'clock (Noon) and "we worked six on and six off," and he could not tell what time that evening he left the tug. His attitude on the witness stand was rather belligerent, which was perhaps to be expected in view of the testimony for the Hope later to be referred to, but there were many things that he ought to have known that he professed not to know: For instance, whether there was free water between the middle of the channel and the Staten Island shore; where the Patience was with reference thereto, at the time of the collision; how far off Staten Island his own tug was, although if he was pointing toward the Fox at a thirty degree angle, as he said, he would have been looking toward that shore over a laden barge that was low in the water.

He heard the exchange of one whistle signals and observed the approach of the Hope and "as we came to the turn opposite the E port recreation pier, the Archers Hope was coming down with the Spartan on the port bow. I was working the Magnetic with her 30-degree wheel, and I was in the pilot house at all times. That is a lie about saying I was not in the pilot house. * * * The ship came bearing down on us and didn't make any effort to stop or anything, and she came in contact with the Magnetic, * * *" i. e., the tug Spartan.

He said that before the contact he did nothing with the tug Magnetic; in spite of the foregoing, he never blew an alarm, although he was aware at some time or other that a collision was going to happen, and he did not know how far apart the two vessels were at that time. Thus:

"Q. And you did not blow a single whistle, did you? A. No, sir.

"Q. Why didn't you? A. Why didn't the Spartan blow one? * * * The reason I didn't blow a whistle is because I was busy and saw no necessity to blow an alarm.

"Q. You wouldn't do that if you were going to have a collision? A. Yes, I would" because "it was in so close quarters, it happened so quick, that I couldn't do it."

When asked if all vessels were travelling slowly, he said, "I don't know."

His towing sheet was produced, and seemingly it contained no reference to the collision. The last entry in his handwriting was at 6:15 P.M. "Assisting Patience off Bayway" and the next entry is at 9:15 P.M., "Off St. George 9:10," but the handwriting was not that of the witness and he said he couldn't identify it. He does not know when he went off watch or who relieved him.

It would be a serious thing to reflect upon Prendergast to the extent of rejecting his testimony that he was in the pilot house and that he maneuvered the Magnetic as he said he did, but an affirmative finding to the effect that the Magnetic functioned at this critical time as required, would not accord with my understanding of the evidence or my observation of the witnesses on the stand. The fact is that a change in watch, according to the quoted testimony, was due to take place at 6:00 o'clock, and I incline to the misgiving that between 6:15 and 6:41 P.M. the handling of the Magnetic was casual indeed. The finding is as follows:

▮ After the exchange of one whistle signals, between the Hope and the Patience, the evidence fails to demonstrate that the Magnetic was maneuvered so as to function as a helper tug, the office of which was to keep the tail of the tow approximately within the Staten Island side of the channel, and this lapse contributed to the collision between the Magnetic and the Spartan, which means that the Magnetic must be held to respond in damages as hereinafter stated.

It is deemed proper to hold the Magnetic rather than the Patience because the former seems to have been an independent element so far as dominion and control is concerned; Noble, captain of the Patience, did not assume responsibility for the actions of either helper tug, nor did he issue any orders to them, but he seemed to rely upon the respective captains to decide how and when their tugs should function, thus distinguishing the relationship between the Patience and the Magnetic on the one hand, and the Hope and the Spartan on the other.

### The Maneuvers of the Hope.

The handling of the Hope also left much to be desired from the standpoint of proper navigation in these waters under the conditions which have been disclosed; when she proposed a port passing, her navigator observed the approaching tow, and it (the exchange of signals) imposed upon each element such handling as could be reasonably expected to accomplish the agreed purpose.

It was clearly shown in the deposition of Dales, the chief officer who was stationed on the forecastle head, and in the testimony of Fitzgerald, the captain of the Spartan, who was navigating the Hope, that the tail of the tow would have a tendency to sag toward the Jersey shore when the rounding of Howland Hook was being accomplished, by reason of the effect of the flood tide on the barges in the third tier; and so it is necessary to consider the engine movements of the Hope in light of the known requirements above stated. At the exchange of whistle signals at 6:35½, the change from slow ahead to half ahead was made, and then at 6:41, a half minute before the collision, the engines were put into full ahead.

According to Fitzgerald's testimony, he observed the tow swinging toward the ship, which was then about off Howland Hook or a little bit to the west; in order to follow the course of the channel he had to direct the vessel to port in order to avoid running into the Jersey shore, and so a left wheel was required. His testimony is: "When I seen the tow's swinging I gave a full ahead signal on the engine, with a hard left wheel to try to throw the side of the ship and the Spartan away from the Magnetic, and also clear the tow ahead of me, and also that the flood tide was on the port bow of the ship and I had to give her that swing."

That was the O'Donnell tow previously mentioned, and while it did not impede the navigation of either the Hope or the Patience tow, Fitzgerald was required to guide his ship with reference to its observed position a half a mile ahead.

Thus the combination of the full ahead on the engines and the hard left rudder coming at this juncture may have seemed to Noble on the Patience and Pero on the Bern as they have described it in the testimony above referred to. However it is found that the Hope took no sheer or dive toward the tow, and never moved out of her own side of the channel.

■ Fitzgerald's testimony is consistent with a somewhat belated recognition that he had misjudged the ability of the tow to carry out the port passing, which is another way of saying that he had proceeded too far, and perhaps too fast, into a situation which presented from the exchange of signals, some hazard to all elements concerned; it is familiar law that no vessel is to be exonerated if it proceeds into a dangerous relation with another solely in reliance upon accepted signals and it seems to me that is just what Fitzgerald did.

■ The Hope, being 542 feet long and her own beam in effect extended to 120 feet with the tugs alongside as described, was required to maneuver in 300 feet of water so as to safely accomplish the turn; while there is no expert testimony to support an untutored opinion, I venture to believe that her engines should not have been moved from slow ahead to half ahead at 6:35½ when the signals were interchanged; even if half ahead was proper at that moment, she should at once have reduced to slow ahead and not after a minute and a half had been permitted to elapse; if the Hope had been moving even a little slower than she was, the tail of the tow would have had sufficient time to get into its own waters, and since the collision was all but avoided as it was, it seems that responsibility should be visited upon the Hope for not having held back sufficiently to insure a safe port passing.

The tow relies on the decision of Gwinn, 1940 A.M.C. 101, in a case not unlike this, involving a collision in April of 1938 in these very waters, but since the channel was then but 395 feet wide, the strictures upon the navigation of the descending ship would scarcely apply to the Hope under the conditions which were here present; I do not think that the latter was required to stop near the nun buoy merely because she observed that the tow was in the position described at the time the one blast signals were interchanged; on the other hand, her own engagement imposed upon her the duty of so proceeding as to avoid collision with the tail of the tow that she knew would occupy part of the Jersey side of the channel for a brief time, coincident with the rounding of Howland Hook.

It is argued for the Hope that the Magnetic was observed alongside the Fox and that she never functioned as a helping tug in arresting the swing of the tail of the tow, and that so far as Dales and Fitzgerald could see, there was no one in the pilot house of that tug. To the same effect, see also Bodino, pilot of the Spartan, and Mortonson, her deckhand. The testimony of these witnesses is very clear concerning the observed position of the Magnetic from the time of the one whistle signal interchange, as having been alongside the Fox and that she took no action whatever to oppose the swing of the tail of the tow.

Assuming this testimony to have been unrehearsed and truly believed by the witnesses, the argument based upon it proves too much or too little. If indeed the Magnetic was doing nothing as seen from the Hope, the latter was not justified in proceeding on the theory that perhaps some time in the future, she would come to life, which means that the ship should have somewhat held back as developing circumstances might seem to require; on the other hand, if the Magnetic was indeed functioning, it became a matter of judgment on the bridge of the Hope as to whether the tug would accomplish her mission in due time, and if the judgment there exercised proved to be unwise, she must still be held to answer for that reason. The understanding presumably present in the mind of the draftsman of the libel in

the Spartan against the Hope, No. 19629, as above quoted, is consistent with what has just been written.

It is found that the Hope was not navigated between 6:35 and 6:41½ P.M., so as to carry out the obvious requirements of a port to port passing with the Patience and her tow, in accordance with the interchange of one whistle signals, and she must therefore be held at fault.

This means that it is a half damage case as between the Hope and the Magnetic.

### The Spartan.

No responsibility for the happening can be visted upon the Spartan since, according to the testimony, both she and the Olsen were being towed by the Hope, and on neither were engines engaged during these critical moments; the Spartan was under the dominion and control of Fitzgerald, acting for the ship, when collision was seen to be inevitable; he ordered the Spartan to drop back on the port side of the Hope; this was accomplished, because the bow line (the eye of which was on the ship and could not be promptly cast loose) was hove at its bight from the tug, and she had drifted a little abaft of amidships at the moment of contact. Bodino, pilot on the Spartan, could not know, prior to receiving the order from Fitzgerald, that he would not at the last minute order the Spartan to thrust against the bow of the Hope by way of avoiding possible trouble, and so it was his duty to await the commands of his superior officer. Baker, Carver, etc., v. Mathiasen, etc., 2 Cir., 140 F.2d 522; Moran, etc., v. Empresa, etc., 5 Cir., 194 F.2d 629.

The finding is that the Spartan was not guilty of fault in the execution of the maneuvers which have been described.

It follows that decrees in accordance with the foregoing are directed to be settled, as follows:

*As to No. 18,932:* The libellant, McLain Line, Inc., as owner of the Barges Fox and Hillside, is to recover against the Archers Hope and the Magnetic jointly, namely, half damage as against each, with costs; and the libel against the Spartan and the Patience is dismissed, but without costs.

*As to No. 19,332:* The libellant, Steamtug Revere, Inc., as owner of the tug Spartan, is entitled to a decree for half damage against the Magnetic, with costs; and the libel against the Patience is dismissed, with costs.

*As to No. 19,629:* The libellant, Steamtug Revere, Inc., as owner of the tug Spartan, is entitled to a decree for half damage against the Archers Hope, with costs.

*As to No. 19,684:* The libel of the Magnetic is dismissed as against the Spartan, and her owner is to recover for one-half her damage against the Archers Hope, with costs.

If additional findings are thought to be required, they may be settled on notice.