**1282**

Complaint of TUG HELEN B. MORAN, INC., as owner and Moran Towing & Transportation Co., Inc., as chartered owner of the TUG DIANA L. MORAN, for exoneration from or Limitation of Liability.

Complaint of TUG DEVON, INC., Plaintiff, as owner of the TUG DEVON, for exoneration from or Limitation of Liability.

No. 72 Civ. 4633.

United States District Court,
S. D. New York.

Sept. 28, 1976.

McHugh, Heckman, Smith & Leonard, New York City, for Tug Devon, Inc.; Richard E. Meyer, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for Tug Helen B. Moran, Inc. and Moran Towing & Transportation Co., Inc.; Robert B. Pohl, Walter H. Hinton, II, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for the State of Connecticut; Donald M. Waesche, Jr., Geoffrey W. Gill, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

On May 17, 1972, the unpowered barge BECRAFT, which was being towed by the tug DIANA L. MORAN and assisted by the tug DEVON, struck the Tomlinson Bridge on the Quinnipiac River near New Haven, Connecticut, causing damage to the barge and the bridge. A trial was held in these consolidated actions to determine the respective liabilities of the parties involved in the accident.

### I.

*The Uncontested Events*

The tug MORAN proceeded on the day of the accident to the Atlantic Cement Company dock on the Mill River at New Haven to take the barge BECRAFT in tow for a voyage to Ravenna, New York. The BECRAFT was being towed stern first and the MORAN was made fast to the BECRAFT's stern. During the trip, the captain of the MORAN, George Calain, Jr., was positioned aboard the BECRAFT to act as pilot in charge of the operation and was in radio communication with the crews of the MORAN and the DEVON, which was positioned to the rear of the barge to act as a rudder in assisting the flotilla.

The flotilla headed down the Mill River toward the junction of the Mill and Quinnipiac Rivers where it was necessary to turn approximately 90° to the right into the Quinnipiac River so that the ships could pass through the Tomlinson Bridge.

The Tomlinson Bridge is of bascule type construction, with leaves that elevate to allow ships to pass. The BECRAFT entered the draw favoring the left side to insure that a kingpost on the starboard side of the barge would clear the overhanging bridge leaf on the right side of the draw. However, the barge slid too far to port and the port side of the barge rubbed the granite abutment of the bridge, damaging both the bridge and the barge. After this collision, the BECRAFT was deflected off the abutment and shortly thereafter a chock on the barge snagged the girder of one of the raised bascule leaves, resulting in substantial damage to the leaf.

## II.

### Contentions of the Parties

The Tug Helen B. Moran, Inc., as owner, and Moran Towing and Transportation Co., Inc., as bareboat charterer of the MORAN, and the Tug Devon, Inc., as owner of the DEVON, seek exoneration from or limitation of liability for the damages sustained by the State of Connecticut, as owner and operator of the Tomlinson Bridge. Connecticut filed claims in and answers to both proceedings.

The tug MORAN asserts that:

(1) The State of Connecticut is solely responsible for the damage caused by the barge's collision with the abutment because the fender system covering the abutment was missing and unrepaired.

(2) The State of Connecticut is solely liable for the damages caused when the chock snagged the girder of the Tomlinson Bridge because the bridge unlawfully deviates from its construction plans as approved by the Secretary of the Army and presents an illegal obstruction to navigation.

(3) The faults in the bridge structure proximately caused the accidents.

(4) The DEVON partially caused the second collision, between the barge's chock and the girder of the bridge, by reversing its engines wrongfully and without orders from the pilot of the MORAN. This reversal of engines, which is claimed to have occurred immediately after the barge hit the bridge abutment, is said to have caused the barge to swing to the left under the leaf of the bridge, and to hit the bridge's leaf.

The State of Connecticut contends:

(1) The Moran Towing & Transportation Co., Inc., as employer and bareboat charterer of the tug MORAN, is liable for the damage to the bridge because (a) the flotilla was proceeding at an excessive rate of speed; and (b) the captain of the MORAN negligently handled the flotilla's passage through the bridge.

(2) The tug DEVON is liable for failing to warn the MORAN pilot that the flotilla was improperly aligned for the passage.

(3) The state should not be held liable for any negligence on its part either in failing to maintain the fender system in proper condition or in the construction of the bridge because such negligence, if any, was passive and not the proximate cause of the accidents.

The DEVON denies that it was negligent in any respect.

## III.

### FINDINGS OF FACT

#### First Collision

The flotilla entered the draw of the Tomlinson Bridge favoring the east or left side. When approximately one-third of the BECRAFT was in the draw, the pilot of the MORAN, Calain, observed that the after end of the barge was sliding too far to port and that as a result the barge was proceeding at a slant. (33, 173–75)[1] Shortly thereafter, the port side of the barge rubbed what existed of the timber fender

---

1. Except where otherwise noted, numbers in parentheses refer to pages of transcript of trial.

system on the northeast abutment of the bridge, causing damage to the steel hull of the BECRAFT.

The bridge abutments on either side of the channel are constructed of granite and designed to include a wooden fender system outside the stone fencing. The fenders are:

> " . . . both for the protection of the bridge and for the protection of the water-borne commerce." *Complaint of Wasson*, 495 F.2d 571, 578 (7th Cir. 1974), *cert. denied*, 419 U.S. 844, 95 S.Ct. 78, 42 L.Ed.2d 73 (1975).

For at least two months prior to the date of the accident the fender system on the northeast abutment was in a broken and deteriorated condition, leaving the abutment unprotected.[2]

### A. Negligent Maneuvering on the Part of the MORAN without a proper lookout

Captain Calain testified that on prior transits the barge had not contacted the fender system. There is no real dispute that the barge entered the Tomlinson Bridge draw not in the middle of the channel, but favoring the left of the passage. MORAN admits that the after end of the barge swung farther to port than was intended. (MORAN post-trial memorandum, p. 29) Calain testified that he was preoccupied with the clearance of the chock under the bridge leaf. (66, 67) As a result, Calain was unaware of the danger the slant of the flotilla presented until the barge was one-third of the way through the bridge draw. (174–75)

During the transit, Calain stood on the starboard side of the barge, at approximately midships. (26) Although he did move about the barge somewhat, his visibility at any particular time was necessarily limited because the BECRAFT is 290 feet long. Moreover, despite the fact that he testified that the pilot in charge of a flotilla

should look "in all directions" (173), his attention was directed only ahead of him. (175) The fact that Calain did not observe the stern end of the flotilla might not have been of consequence if he had directed his crew to keep a lookout, but such an order was not given. A deckhand from the MORAN had boarded the BECRAFT at the Atlantic Cement pier (14, 24) but had no assigned duties to perform while the flotilla was proceeding through the Tomlinson Bridge draw. (66) In view of Calain's limited scope of visibility, the deckhand should have been assigned as a lookout.

We find that the swerve of the flotilla to the left was a proximate cause of the collision with the fender system and granite abutment. We also find that the failure to perceive the danger and to avert the accidents was proximately caused by Calain's failure to observe the swing of the barge in time to arrest it and to post another lookout who could have seen the condition.

### B. Excessive Speed

The tug captains of the MORAN, DEVON and Calain all testified that the speed of the flotilla when entering the draw was approximately 1½ to 2 knots, the speed maintained on prior occasions (Calain 33; Burns 94–95; Quarry 316). Mazzucco, the bridge tender, testified that he thought the flotilla was going unusually fast. Mazzucco's log recorded the MORAN's signal to enter the draw at 2:00 P.M., the time the bridge was raised at 2:02, and the collision between the chock and the bridge leaf at 2:04. From these times and the distances necessary to travel from the point at which the MORAN signaled to the point at which the collision occurred, the State calculates that the flotilla must have proceeded at 5 knots. We do not find the log's recordings to be conclusive, however. The State admits that the times recorded for the blowing of the two blasts and the time of the collision "are not precise." (State's post-tri-

---

**2.** The State of Connecticut does not dispute these facts. The State argues, however, that the missing fender system was not the proximate cause of the damage to the BECRAFT's hull, but that the state of the fender system was merely a passive condition and the cause was the negligent maneuvering of the flotilla, without proper lookouts and at an excessive rate of speed.

al memorandum, p. 8) Moreover, the MOR-AN's log shows that the operation started at 1:50 P.M. and the collision occurred at 2:05. There is thus a significant variance between the MORAN's log and that of the bridge tender. (MORAN Ex. 1) On the basis of the MORAN's figures, the flotilla would have been proceeding at a speed of about 2 knots. In view of the discrepancy between the logs, the admission that the bridge tender's notations are not precise, and the unanimous testimony of the tug captains that the flotilla was not traveling at an excessive rate of speed, we find that the preponderance of the evidence establishes that the flotilla was not traveling at an excessive rate of speed.

### C. Negligence of the State

Regardless of negligence on the part of the MORAN or DEVON, the State is accountable for its failure to maintain the fender system properly. Had the system been in good condition, the barge would not have contacted the granite abutment and would not have sustained the damage to its hull. Accordingly, we find the failure to maintain the fender system in proper condition to be a proximate cause of the damage.

### D. Liability of the DEVON

Although MORAN does not charge the DEVON with responsibility for the barge's contact with the fender system, the State of Connecticut contends that the DEVON should be held partially liable for both accidents because the master of the DEVON failed to warn the MORAN pilot that the flotilla was not properly aligned for passage through the Tomlinson Bridge.

The evidence fails to establish such negligence. Charles Quarry, master of the DEVON, testified that at the start of the voyage all that he could see in front of him while standing in the DEVON's pilot house was the "big red bow" of the BECRAFT, its deck and the sky. (298) As the flotilla started, the DEVON backed off several feet (300) but not enough to enlarge the area of Quarry's visibility. As the flotilla began its approach to the Tomlinson Bridge, the DEVON was "directly behind the barge, right head-on." (302) Even as the barge, and then the tug, angled into the draw, Quarry's vision was limited; he testified that he could not see the chock on the barge and did not know the specific nature of the second collision. Under these circumstances, Quarry cannot be deemed negligent for failing to warn the MORAN pilot about a condition that he could not see.

## IV.

### FINDINGS OF FACT

*Second Collision*

After contacting the fender and abutment, the BECRAFT was deflected starboard into the channel. However, shortly thereafter the four foot chock on the barge's port side collided into a girder on one of the overhanging bridge leaves, damaging the bridge and the barge.

MORAN contends that the State is liable for the damage because the bridge leaves were not elevated to the angle required in the bridge's permit and that the DEVON is liable for backing astern after the contact with the fender system and without orders from the MORAN pilot.

### A. The Bridge

The Tomlinson Bridge was built pursuant to a permit granted in 1922 by the United States Army Corps of Engineers, as required by the Rivers and Harbors Act of 1899 (33 U.S.C. § 401). The bridge was completed in 1925.

The approved plans specified the expected width of the water between the bridge abutments to be 126 feet and required that no part of the leaves when elevated extend over the water. To achieve this requirement the leaves must be capable of raising to an angle of 82 degrees above horizontal.

As constructed, however, the bridge is incapable of elevating to an 82 degree angle and, since its completion, the State concedes that the leaves have only been elevated to an angle of approximately 65 degrees.[3]

---

**3.** Although the MORAN contends that the leaves in fact were only elevated to an angle of

55–58 degrees, Captain Calain testified that the bridge was elevated about 65 degrees (161).

## B. The BECRAFT

The BECRAFT is 290 feet in length, and 55 feet in beam. The horizontal clearance between the Tomlinson Bridge abutments is about 126 feet, or 71 feet wider than the width of the barge. When the leaves open to an angle of 65–67 degrees, they extend nineteen feet over the water on each side, leaving an unobstructed clearance of 88 feet. Immediately prior to entering the Tomlinson Bridge draw, the flotilla had passed without incident through the Chapel Street Bridge draw where horizontal clearance was 71 or 72 feet (25, 300). Moreover, both Quarry and Calain testified that the BECRAFT had cleared the Tomlinson Bridge on numerous occasions during the two years preceding the accident when the leaves had been elevated to the same angle as on the day of the collision. (161, 162, 331) Whatever hazards the leaves presented were clearly known to Calain.

Furthermore, as found above, the MORAN pilot maneuvered the flotilla into the draw favoring the left, and due to inadequate attention to the barge's position, the danger of the slant was not noticed in time to avert the collision with the granite abutment. It is reasonable to conclude that the barge's chock would not have snagged the bridge leaf had the BECRAFT not been on the left side of the draw. Thus, the same negligent maneuvering that caused the collision with the fender system and the granite abutment also caused the collision between the chock and the bridge leaf. There is no reason to believe that if the barge had been in the center of the draw, it would not have passed through safely as it had on prior occasions.

## C. The Effect of the Contact with the Fender System

Calain testified that had the fender system been in proper repair, the BECRAFT would have deflected further into the channel before striking it; that is, the barge would have been positioned more toward the center of the passage, and the chock would not have struck the bridge girder. (49) However, two witnesses employed by MORAN, Watkins and Warm, testified to the contrary. (145, 169) We find that the preponderance of the evidence is that any added deflection of the barge that would have resulted from a proper fender system would not have prevented the collision between the chock and the girder.

Calain also testified that after the BECRAFT hit the fender system and the abutment, he estimated that the barge would clear the bridge leaf without difficulty. (36–37, 45) Only the upper five to six inches of the chock engaged the girder. If the barge had been only three inches further to the right in the channel, the contact would not have occurred. (287–88; MORAN Ex. 54) Had Calain realized that only a slight movement to the right would have prevented the accident, he could have taken steps to achieve this. No such steps or orders to take any such steps were given.

In sum, the evidence established that although Calain understood the angle of the leaf, he miscalculated the positioning of the barge and did not execute orders necessary to avoid the collision.

## D. The Alleged Liability of the DEVON

The MORAN asserts that after the BECRAFT contacted the fender system and the granite abutment of the bridge, the

---

This discrepancy is in actuality a matter of mathematics rather than of the actual elevation of the leaves. One of MORAN's surveyors, Watkins, measured the angle of elevation of the outer surface of the damaged leaf as between 55 and 58 degrees. (124) He testified that the inner surface of the leaf's girder closest to the water angles approximately 12½ degrees even when in a horizontal position and that that angle must be added to whatever angle of elevation the leaf attains. Thus, the sum of these figures equals the elevation of the leaf at the point the chock contacted it. (127, 128, 132, 147–48) MORAN's other surveyor, Halboth, measured the leaf elevation on May 19, 1972 as approximately 65 degrees (State Ex. J., p. 2)

barge, which deflected to the right into the channel, would have cleared the passage under the bridge leaf if the DEVON had not wrongfully and without orders reversed engines, pulling the after end of the BECRAFT to the left and under the raised leaf, until the chock caught the girder. The captain of the DEVON, Quarry, denies reversing engines without orders. (310, 315)

The MORAN pilot, Calain, testified that after the barge contacted the fender system he saw a puff of smoke directly behind the BECRAFT and in line with the mast of the DEVON. (72) The MORAN contends that this smoke was caused by the DEVON backing her engines full astern.

At the time Calain allegedly saw the mysterious smoke, however, he did *not* assume that the DEVON was backing and made no attempt to contact the tug by walkie-talkie to order her to stop or to ask the cause of the smoke. (73) Calain admitted that because he could see nothing of the DEVON but her mast, he had no way of knowing what had happened and that although the smoke could have been caused by the DEVON's going forward and not astern, he assumed that the tug went astern because the BECRAFT began to deflect to the left and towards the bridge. (73)

Calain's testimony is insufficient to establish that the DEVON negligently backed astern without orders. To begin with, Calain's view of the DEVON was so obstructed that he could not tell the tug's movements. Secondly, there is a serious dispute as to what effect the DEVON's backing—if she backed—would have had on the BECRAFT's movements. Calain testified that the effect of the DEVON's backing full astern would be to back to port. (28–29, 63) Quarry denied that the DEVON would do so with a two knot headway. (314) In addition, the DEVON contends that it was positioned to the BECRAFT's starboard and that even if the tug had backed astern, the backing could not have caused the BE-

CRAFT to deflect to the left. The MORAN disagrees and argues that the DEVON was directly behind the BECRAFT. The testimony of Mazzucco, the bridge tender, and those aboard the DEVON that there was strain on the tug's port line supports the contention that the DEVON was angled to the BECRAFT's starboard. (210, 212, 303, 348, 369–70) Calain testified, however, that he saw the puff of smoke on the center line of the barge. (38) An indentation in the center line of the BECRAFT's plating, if made on the day of the accident, would have been caused by the DEVON's striking the plate headon and supports the MORAN's theory. Neither the contention of the MORAN nor of the DEVON as to the DEVON's position is supported by clear-cut evidence.

There is another, and more plausible, explanation for the BECRAFT's movements. The mate of the MORAN, Burns, who was the officer in charge of the MORAN during the passage, testified that he doubled the speed of the MORAN without specific instructions from Calain after the barge hit the fender system and before it contacted the bridge leaf. (82, 96) At the time the forward end of the BECRAFT was being towed in a westerly direction,[4] or to the right, and the sudden increase in speed could have caused the after end of the BECRAFT to swerve toward the east, or left, into the bridge. Thus, even if the BECRAFT might otherwise have avoided contacting the bridge leaf, the MORAN's increase in speed could have drawn the barge further to port and under the leaf.

█ In view of Calain's limited vision of the DEVON, his failure to check at the time as to whether the DEVON had backed astern, the serious dispute as to the effect any backing would have, and the MORAN's own movements, we find that the evidence does not support the conclusion that the DEVON wrongfully backed astern, and that the BECRAFT's deflection to the left was caused not by any action on the part of

---

4. Immediately after the MORAN increased her speed, her port gate line broke (97–98), indicating that there was more strain on the port line and that the barge was being pulled to the right.

the DEVON but by the MORAN's increasing speed following the contact with the fender system. In conclusion, the general failure of the MORAN's captain to keep the flotilla angled properly through the draw and to take steps to have the barge pulled to center after the first collision, as well as the acceleration of the MORAN after the first impact caused the barge to pass under the bridge leaf and the chock to strike the girder.

## V.

### CONCLUSIONS OF LAW

#### A. First Collision

■ Fender systems which surround a bridge abutment are designed to cushion collision of boats with bridges that cannot altogether be avoided. *Complaint of Wasson, supra,* 495 F.2d at 579. However, the collision itself was caused not by the defects of the fender system but by the failure of the pilot to see the danger of the barge's position or to post a proper lookout who could have seen the danger in time to act to prevent the accident.

According to Article 29 of the Inland Rules of the Road (33 U.S.C. § 221):

> "Nothing . . . shall exonerate any vessel, or the owner or master or crew thereof from the consequences of any neglect . . . to keep a proper lookout."

As stated above, Captain Calain, the pilot in charge of the flotilla's movements, did not adequately keep note of the barge's position. The court in *United States v. Holland,* 151 F.Supp. 772, 777 (D.Md.1957) noted that, where, as here, the pilot has additional responsibilities, he cannot alone be a proper lookout. In any event, a lookout must be stationed at the proper place where the risk of danger may be most readily perceived. See *Compania Maritima S. A. v. Moran Towing & Transportation Co.,* 197 F.2d 607, 609–10 (2d Cir. 1952). No such lookout was stationed on board the BE-CRAFT. The failure timely to observe a dangerous condition and to take means to correct the condition constitute acts of negligence. *Chitty v. M. V. Valley Voyager,* 284 F.Supp. 297 (E.D.La.1968), *aff'd,* 408 F.2d 1354 (5th Cir. 1969).

■ The MORAN's departure from its statutory obligation to post a proper lookout not only constitutes negligence but triggers application of *The Pennsylvania* doctrine:

> "that when the fault consists in the breach of a 'statutory rule intended to prevent collisions . . . the burden rests upon the ship of showing, not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.'" *Merritt-Chapman & Scott Corp. v. Cornell Steamship Co.,* 265 F.2d 537, 539 (2d Cir. 1959) (L. Hand), quoting from *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874).

■ But although the MORAN pilot was negligent, this negligence does not exonerate the State of Connecticut from liability for the damage caused by the first collision. Allowing a condition such as the disrepair and absence of a fender system to exist was a material fault on the part of the State. *Complaint of Wasson, supra,* 495 F.2d at 578–80. The State's failure to maintain the fenders in good repair was also in disregard of the bridge plans approved by the War Department, and constituted a violation of § 9 of the Rivers and Harbors Act (33 U.S.C. § 401). The State's violation of the statute renders *The Pennsylvania* rule applicable to it as well as to MORAN. *Complaint of Wasson, supra,* 495 F.2d at 579–80. In a case such as this where both parties have violated a duty, damages are apportioned equally. *Merritt-Chapman & Scott Corp. v. Cornell Steamship Co., supra;* accord, *Board of Commissioner of Port of New Orleans v. M. V. Agelos Michael,* 390 F.Supp. 1012, 1016 (E.D.La.1974).

#### B. Second Collision

■ The discrepancy between the approved plans for the bridge which specified that the leaves be elevated to an angle of 82 degrees and the bridge's actual capability of

rising to only 65 degrees violates § 9 of the Rivers and Harbors Act (33 U.S.C. § 401) which provides:

".   .   . it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received approval of the Chief of the Engineers and of the Secretary of the Army."

It is conceded that the State obtained no authorization modifying the plans.

However, unlike the rotted fender system, Captain Calain had actual knowledge of the limited elevation of the bridge leaves (22–3, 27, 101, 102) and knew or should have known of their potential danger. See *Sabine Towing & Transportation Co. v. St. Joe Paper Co.*, 297 F.Supp. 748, 752 (N.D.Fla. 1958). The accident occurred because the MORAN pilot misjudged the danger from the leaves. Such miscalculations by a pilot who is, or under the circumstances ought to be aware of the danger, constitutes negligence. *Pennsylvania Railroad Co. v. The S. S. Beatrice*, 161 F.Supp. 136, 145 (S.D.N.Y. 1958). And see *McLain Line v. The Archers Hope*, 109 F.Supp. 128, 136 (E.D.N.Y.1952). The MORAN pilot thus failed to fulfill his duty of meeting the reasonably foreseeable danger implicit in the situation with the degree of care and skill that a prudent navigator would exercise under the circumstances. *South, Inc. v. Moran Towing & Transportation Co.*, 360 F.2d 1002, 1006 (2d Cir. 1966).

The collision of the chock with the girder closely approximates the facts in *In re Great Lakes Towing Company*, 348 F.Supp. 549 (N.D.Ill.1972) in which a ship, found to have been maneuvered negligently, collided with a bridge that was elevated to an angle of 75 degrees instead of 82 degrees as specified in its plans. The court there held:

"There can be little doubt, therefore that the Buko Maru was principally responsible for this collision. The evidence fails to establish that the railroad was more than a minor or passive contributor.

This is not a case where the negligence of the bridge owner so clearly contributed that it should share the damages equally with a negligent shipowner, as in *Atlee v. Northwestern Union Packet Co.*, 88 U.S. 389, 21 Wall. 389, 22 L.Ed. 619 (1875). If the bridge owner had the burden of proving that its departure from the War Department permit could not have contributed to the collision, as some collision cases apparently hold (cf. *Circle Line Sightseeing Yachts v. City of New York*, 283 F.2d 811 (2d Cir. 1960); *The Pennsylvania v. Troop et al.*, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1874)), this burden has not and cannot be sustained under the circumstances of this particular collision. If on the other hand, the shipowner had the burden of proving that the condition of the bridge did in fact contribute to the collision, this burden has not been sustained either. *P. Dougherty Co. v. United States*, 207 F.2d 626 (3rd Cir. 1953), cert. den. 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068 (1954). This apparent inconsistency should be resolved realistically and equitably by limiting the rule of *The Pennsylvania* (*supra*) to moving ships which were actively or primarily negligent. Certainly the *Pennsylvania* and the *Atlee* courts were not deciding a controversy similar to the one at bar. Since the evidence fails to establish causation on the part of the bridge, it seems fair that the negligent shipowner should bear the damages. *The Umbria*, 166 U.S. 404, 405, 17 S.Ct. 610, 41 L.Ed. 1053 (1897)." 348 F.Supp. at 554.

In view of Calain's prior knowledge of the elevation of the leaves, the slant of the flotilla in the draw, the failure to post a proper lookout, and to give orders to avert the danger, it is just to follow the rule of *In re Great Lakes Towing Company* and to hold the MORAN liable for the damage to the bridge and the barge.

■ In conclusion damages resulting from the first collision of the barge and the fender system are to be apportioned between MORAN and the State.[5] MORAN is

5. The State of Connecticut waived its sovereign immunity when it filed suit for the damage to the bridge. See, e. g., *United States v. Norwe-* *gian Barque "Thekla"*, 266 U.S. 328, 45 S.Ct. 112, 69 L.Ed. 313 (1924); *Burgess v. M. V. Tamano*, 382 F.Supp. 351, 355 (D.Me.1974).

solely liable for damage caused to the barge and the bridge by the second collision of the chock and the girder. The DEVON is not liable either to MORAN or the State. The issue of limitation of liability is reserved until the actual amount of damages is determined.

This Memorandum constitutes the court's findings of fact and conclusions of law.