In the Matter of the Complaint of TUG HELEN B. MORAN, INC., as owner, and Moran Towing & Transportation Co., Inc., as chartered owner, of the TUG DIANA L. MORAN for exoneration from or limitation of liability, Plaintiffs.

STATE OF CONNECTICUT,
Claimant-Appellant,

v.

MORAN TOWING & TRANSPORTATION CO., INC., Plaintiff-Appellee.

No. 1115, Docket 79–7156.

United States Court of Appeals,
Second Circuit.

Argued May 24, 1979.

Decided Oct. 1, 1979.

Donald M. Waesche, New York City (Waesche, Sheinbaum & O'Regan, New York City, of counsel), for appellant, State of Conn.

Robert B. Pohl, New York City (Walter H. Hinton II, Burlingham, Underwood & Lord, New York City, of counsel), for appellee, Moran Towing & Transp. Co., Inc.

Before LUMBARD, MANSFIELD and GURFEIN, Circuit Judges.

MANSFIELD, Circuit Judge:

In these consolidated actions in the District Court for the Southern District of New York arising out of a collision on August 1, 1976, between a barge being towed by tugs and the leaf of an overhanging bridge owned by the State of Connecticut (the State), in which the parties seek exoneration from liability and indemnity, the State appeals from a judgment entered on December 5, 1978, by Judge Constance Baker Motley allocating liability between the owners of the Tug Diana L. Moran and the State. The State claims that the district court erred in finding the State 66⅔ percent at fault and Moran Towing and Transportation Co., Inc. (Moran Towing) 33⅓ percent at fault. We affirm the judgment of the district court.

The Tomlinson Bridge, spanning the Quinnipiac River at the port of New Haven, Connecticut, is a bascule bridge, with leaves that elevate to allow ships to pass. Under the construction permit granted by the Army Corps of Engineers in 1922, the leaves were supposed to elevate to an angle of 82 degrees above horizontal. When so raised, the bridge would not extend over the water, and would leave a navigable channel 126 feet wide. The actual construction in 1925 departed from this permit, allowing elevation to an angle of only 65 degrees (leaving 84 feet between the tips of the raised leaves). We have previously concluded in a case between the same parties arising out of a similar allision with the same bridge that this deviation, being in violation of the Rivers and Harbors Act of 1899, 30 Stat. 1151, 33 U.S.C. § 401,[1] constituted negligence, *Complaint of Tug Helen B. Moran, Inc.,* 560 F.2d 527 (2d Cir. 1977). Indeed, the State's negligence in this regard had been a cause of two earlier allisions between tugs operated by Moran Towing and the bridge, occurring on May 17, 1972, and November 9, 1975. The allision in the present case occurred when a chock on the

---

1. Section 9 of the Rivers and Harbors Act provides in part:

That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans . . . unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army.

barge snapped an overhanging leaf of the bridge. At the time of the accident the bridge was opened by an automatic mechanism to 57 degrees (leaving 68 feet between the tips of the raised leaves). A further 8 degrees of elevation could be obtained if the bridge tender pressed a "deadman switch," but the tender on duty had not been instructed by the State of this capability. In any event, if the bridge had been elevated to the full 82 degrees angle as required by the original Army construction permit, the water span between the two bridge abutments would have been 126 feet and the allision would not have occurred.

At the time of the allision, parts of the bridge were undergoing repairs. The Coast Guard had published a notice informing all mariners that only one leaf of the bridge would be operative except at certain times or if advance notice of passage were given. Both leaves were raised, however, when the accident occurred.

On August 1, 1976, the tugs guiding the cement barge Becraft were maneuvered so that chocks mounted on the barge came into contact with the bridge. The Tug Diana led the barge, and the Tug Newport followed. The trial court found that the captain of the Diana (who directed the entire operation) and the Diana were negligent because of the captain's failure, in light of weather conditions and the two prior accidents, to alert his crew and take precautions to avoid drifting into the bridge, his failure to give timely and proper directions to avoid the allision, and the failure of two deckhands to give the captain earlier warning of the impending mishap. The following tug Newport was found not to have been negligent.

The district court concluded that the negligence of the State amounted to 66⅔ percent of the total, and that Moran Towing bore responsibility for the remainder.

In a lawsuit arising out of the first of the two earlier collisions, the United States District Court for the Southern District of New York, Morris E. Lasker, *Judge,* had found the State 35 percent liable and Moran Towing 65 percent liable. There, however,

the events were somewhat different from the present case. The flotilla was deliberately guided down the left side of the channel to avoid striking the leaf on the right. Due to the negligence of the crew, the procession slid so far to the left that it hit not merely the bridge leaf but the abutment of the bridge as well. *Complaint of Tug Helen B. Moran, Inc.,* 420 F.Supp. 1282 (S.D.N.Y.1976), *revd.,* 560 F.2d 527 (2d Cir. 1977).

In the suit arising out of the second of the earlier allisions, Judge Cooper of the District Court for the Southern District of New York, apportioned 45 percent of the liability to the State. There again, the events were different from the present case. The tug following the barge had failed to obey the instructions of the captain of the leading tug, and the captain failed to correct for this deficiency. The court apportioned 25 percent of the liability to the leading tug and 30 percent to the following tug.

Appellant's contentions on appeal are that the district court's allocation of liability was unreasonable and that it was bound by the doctrine of stare decisis to find the State's liability closer to the proportions allocated in the two earlier cases.

## DISCUSSION

■ We find no merit in the State's attempt to invoke the doctrine of stare decisis, since the doctrine is not applicable to determinations of fact:

> In view of the fact that stare decisis is concerned with rules of law, a decision depending on the facts is not controlling precedent as to a subsequent determination of the same question on different facts and a different record.  .   .   .

1B Moore's Federal Practice ¶ 0.402[2], at 117. Fault allocation is a question of fact. *Master Shipping Agency, Inc. v. M. S. Farida,* 571 F.2d 131, 134 (2d Cir. 1978); *Getty Oil Co. (Eastern Operations) v. SS Ponce de Leon,* 555 F.2d 328, 334 (2d Cir. 1977).

■ With respect to appellant's claim that the court's allocation was unreason-

able, the rule governing appellate review is that:

> [the lower court's] approximation of the degree of fault will not be disturbed unless it is clearly erroneous. The mere fact that we may disagree with the allocation will not be sufficient to set it aside unless we are left with the definite and firm conviction that a mistake has been committed after reviewing the entire evidence.

*Getty Oil Co. (Eastern Division) v. SS Ponce de Leon, supra,* 555 F.2d at 335. See also *Master Shipping Agency, Inc. v. M. S. Farida, supra,* 571 F.2d at 134.

Nor do we find any merit in appellant's contention that the allocation of less responsibility to the State in the two earlier cases demonstrates that the allocation here —66⅔ percent—was unreasonable. There are differences between the cases which could have justified a higher assessment against the State here than for the two earlier accidents. For example, in the first accident Moran Towing's employees led the parade so far off center that they hit the abutment and were then deflected into the leaf; here, they did not. In the second accident, an additional party was negligent and thus the blame was divided among more actors. While the three incidents were similar in many respects, we cannot infer from this similarity and the involvement of the same parties with respect to the same bridge that the district court was clearly mistaken in apportioning to the State a greater part of the blame than did the earlier courts.

█ Appellants further argue that the Coast Guard notice of repairs put Moran Towing on notice of the risks of passage, and therefore that the liability of the State should be lower. The notice, however, called attention only to the fact that one leaf of the bridge might be inoperative; in fact, both leaves were raised to their usual degree of elevation and, regardless of the repairs, would not have been raised to the 82-degree angle dictated by the permit and plan for the bridge issued by the Secretary of War and the Chief of Engineers. The repairs and the notice thereof were therefore unrelated to the hazard which was a cause of the accident.[2]

We conclude that the district court's ruling has not been shown to be clearly erroneous. The judgment is affirmed.

LUMBARD, Circuit Judge (dissenting):

I dissent.

The result of an affirmance of Judge Motley's apportionment of 33⅓ percent blame to Moran and 66⅔ percent blame to the State of Connecticut will be to make it increasingly less expensive and more fun for the careless navigators of the Moran Towing and Transportation Company to crown each succeeding rendezvous with the Tomlinson Bridge with a resounding allision. I cannot agree that the obvious carelessness of the Moran navigators should be mostly at the expense of the bridge and the State.

The condition of the bridge has long been known to all those who must bring their boats up and down the Quinnipiac River. A Moran vice-president testified that his company had made the tow in question in this case approximately 150 times between 1970 and August 1, 1976, the date of the allision. (Joint Appendix at pp. 113, 132). For forty-seven years since its completion in 1925 the bridge had been capable of elevation only to the angle of 65 degrees. At the time of the accident the bridge was able to open only to 57 degrees, in part because of repair work required by the allision of the same tug with the same bridge on May 17, 1972.

---

2. We do not imply that had the notice comprehended the actual hazard, i. e., the bridge's noncompliance with the 82-degree elevation requirement, the State's liability would be diminished. Moran Towing had knowledge of this deficiency prior to all three of the allisions. To relieve the State of its liability on this account would "frustrate the congressional purpose to safeguard navigation." *Complaint of Tug Helen B. Moran, Inc., supra,* 560 F.2d at 529. See also *The Fort Fetterman v. South Carolina State Highway Dept.,* 261 F.2d 563, 565–66 (4th Cir. 1958), *revd. in part,* 268 F.2d 27 (4th Cir. 1959).

(Appellants Brief at pp. 2–3).[1] Notice to this effect was published biweekly from April 23, 1975 until December, 1976 in the official U.S. Coast Guard notice to Mariners.

To be sure, the construction of the bridge deviated from the terms of the construction permit granted by the Army Corps of Engineers and, under section 9 of the Rivers and Harbors of 1899, 30 Stat. 1151, 33 U.S.C. 401, such deviation was "unlawful." Such a statutory provision may be enough, in my view to support a shifting of the burden of proof in the first case, or first few cases, arising out of the condition.

Here the record shows that the tug Diana L. Moran has towed the barge Becraft into an allision with the Tomlinson Bridge on at least two prior occasions, May 17, 1972 and November 9, 1975. The first of this series of allisions resulted in an allocation of liability of 35 percent to the State and 65 percent to Moran, *Complaint of Tug Helen B. Moran, Inc.*, et al., 1978 A.M.C. 1962 (S.D.N.Y.1978); the second in an apportionment of 45 percent of the liability to the State and 55 percent to Moran (Docket No. 76 Civ. 1786, filed Nov. 8, 1976, Cooper, J.). In the first of these cases Judge Lasker found that the captain of the Moran tug had actual knowledge of the limited elevation of the bridge and absolved the State of liability. This Court reversed on the ground that "[t]he violation of the statute was, as a matter of fact, a cause of the accident." *Complaint of Tug Helen B. Moran, Inc.*, 560 F.2d 527, 528 (2d Cir. 1977), reversing 420 F.Supp. 1282 (S.D.N.Y.1976). Here the violation of the statutory duty (the bridge's non-compliance with the Army Corps' terms of approval) cannot be said to have "caused" the accident. In this case the issue of negligence must be considered along with past incidents involving the same appellees and the same bridge. The majority misses the point when it distinguishes the sequence of events in this allision from those of prior allisions. It fails to give enough weight to the fact that there were prior allisions for which Moran's men were in some part responsible.

The bridge and its leaves are stationary. The choice of course and maneuver of the Moran tugs are entirely in Moran's control and discretion. No matter how careless the Moran navigators may be, there is nothing anybody on the bridge can do beyond elevating the leaves. By now the Moran captains are fully familiar with the hazards posed by the Tomlinson Bridge. Despite much evidence to the contrary, the law must assume that they know how to operate their tugs to avoid striking the leaves of the bridge.

The facts in this case are all conceded. We are therefore, in as good a position as the district court to apportion damages. In any event, the apportionment ordered by the district court is clearly erroneous in light of the repeated contributory negligence of the appellees. *Getty Oil Co. v. S. S. Ponce de Leon, et al.*, 555 F.2d 328 (2d Cir. 1978).

I would reverse the judgment of the district court and dismiss the complaint.

---

1. The majority's opinion points out that use of a "deadman's switch" might have added 8 degrees more of elevation to the bridge, and that the bridge operator had not been instructed in the use of the switch. However, this delict on the State's part seems irrelevant in light of testimony by the bridge operator that he did not expect an allision until it occurred, negating any hypothetical inference that the deadman's switch might have been used to avoid the accident. (Joint Appendix at p. 145).